# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| IN RE: GENERIC PHARMACEUTICALS PRICING ANTITRUST LITIGATION | MDL 2724 16-MD-2724 HON. CYNTHIA M. RUFE |
| IN RE: DOXYCYCLINE CASES | |
| THIS DOCUMENT RELATES TO: *ALL INDIRECT RESELLER PLAINTIFF (IRP) ACTIONS* | 16-DX-27243 JURY TRIAL DEMANDED |

## INDIRECT RESELLER PLAINTIFFS'

## CLASS ACTION COMPLAINT

## <u>TABLE OF CONTENTS</u>

I.      INTRODUCTION .................................................................................................1

II.     THE ROLE OF INDEPENDENT PHARMACIES.............................................6

III.    JURISDICTION AND VENUE .........................................................................7

IV.     PARTIES .............................................................................................................8

     A.      Plaintiffs .................................................................................................8

     B.      Defendants ..............................................................................................9

     C.      Co-Conspirators ...................................................................................11

V.      INTERSTATE TRADE AND COMMERCE ...................................................12

VI.     FACTUAL ALLEGATIONS .............................................................................13

     A.      The generic drug market is a commodities market, where competition historically has been keen. .................................................................................13

     B.      Pricing of generic drugs discourages unilateral price increases ...........................16

     C.      Defendants conspired to, among other things, fix Doxycycline prices. ...............17

          1.      Doxycycline Regular Release ..................................................18

               a.      Defendants' dominance over Doxycycline Regular Release sales permitted them to fix prices, rig bids, and engage in market and customer allocation, and their abrupt price increases are otherwise inexplicable. ..................................................................18

               b.      Defendants' collective market dominance permitted them to collude. ..................................................................19

               c.      Defendants' effective prices were remarkably stable before skyrocketing in the Class Period. ..................................................................19

               d.      As part of the conspiracy, Defendants increased their WAC benchmarks exorbitantly within weeks of each other. ...................24

               e.      Whatever shortages or other market changes may have occurred during the Class Period, they alone cannot have caused the extraordinary price increases. ..................................................................26

               f.      Reported "shortages" do not correlate with reduced sales............26

          2.      Doxycycline DR..................................................29

a.    Defendants' dominance over Doxycycline DR sales permitted them to fix, maintain, and stabilize prices, rig bids, and engage in market and customer allocation. ...................................................29

b.    The Doxycycline DR scheme. ........................................................29

D.    Defendants orchestrated their collusion through in-person meetings at trade association meetings, industry meetings, and other events...................................32

1.    Investor communications demonstrate Defendants' intent to fix and maintain  supracompetitive prices. ...........................................................45

2.    Industry commentary indicates Defendants' collusion is a plausible explanation for the increase in Doxycycline price....................................50

E.    Defendants' conduct in generic drug pricing is under investigation by the United States Congress, the DOJ, and the State Attorneys General.................................51

1.    In response to news reports of the dramatic rise in price of certain generic drugs, Congress launched an investigation into the dramatic rise in price of certain generic drugs. ....................................................................51

2.    The DOJ launched a broad criminal investigation into anticompetitive conduct by generic drug manufacturers. ...................................................54

3.    Led by the State of Connecticut, 45 state attorneys general launched their own investigation of antitrust violations in the generic drug industry........59

VII.    THE DOXYCYCLINE MARKET IS HIGHLY SUSCEPTIBLE TO COLLUSION ......62

VIII.    THE STATUTES OF LIMITATIONS DO NOT BAR PLAINTIFFS' CLAIMS ............64

A.    The statutes of limitations did not begin to run because Plaintiffs did not and could not discover Defendants' unlawful conspiracy .............................................64

B.    Fraudulent concealment tolled the statutes of limitations.....................................66

1.    Active concealment of the conspiracy .......................................................67

2.    Plaintiffs exercised reasonable diligence .....................................................69

IX.    CONTINUING VIOLATIONS .........................................................................................70

X.    DEFENDANTS' ANTITRUST VIOLATIONS...................................................................70

XI.    CLASS ACTION ALLEGATIONS ..................................................................................73

XII.    CAUSES OF ACTION ......................................................................................................76

XIII.   PRAYER FOR RELIEF ................................................................................................119

XIV.   JURY DEMAND ........................................................................................................121

# I.    INTRODUCTION

1.    Plaintiffs West Val Pharmacy, Halliday's & Koivisto's Pharmacy, Russell's Mr. Discount Drugs, Falconer Pharmacy, Deal Drug Pharmacy, and Chet Johnson Drug, bring this Class Action Complaint on behalf of Classes (defined below) of independent pharmacies that indirectly purchased generic Doxycycline Hyclate ("Doxycycline")[1] from Defendants Actavis Holdco U.S., Inc., Heritage Pharmaceuticals, Inc., Mayne Pharma USA, Inc., Mylan Inc., Mylan Pharmaceuticals Inc., Sun Pharmaceutical Industries, Inc., or West-Ward Pharmaceuticals Corp.

2.    In the pharmaceutical industry, the entry of generic versions of branded drugs usually results in aggressive price competition, which in turn reduces prices for drug wholesalers, retail pharmacies, consumers, and third party payors.  Defendants here, however, conspired to thwart the economic benefits of generic competition.

3.    This is a civil action seeking treble damages arising out of the Defendants' unlawful scheme to fix, maintain, and stabilize prices, rig bids, and engage in market and customer allocation of Doxycycline.  As set forth below, Defendants' scheme violates Section 1 of the Sherman Act, 15 U.S.C. § 1 and the antitrust, consumer protection, and unjust enrichment laws of various states.  Defendants were not alone in subverting the operation of a competitive marketplace for generic pharmaceuticals.  Defendants' anticompetitive conduct in the Doxycycline market is part of a larger conspiracy or series of conspiracies involving many generic pharmaceutical manufacturers and many generic pharmaceuticals.

4.    Plaintiffs' allegations are based on personal knowledge of these matters relating to themselves and upon information and belief as to all other matters.  Part of Plaintiffs' allegations

---

[1] Regular release capsules (50 or 100mg) and tablets (100mg) (together, "Doxycycline Regular Release") or delayed release tablets (75, 100, and 150mg) ("Doxycycline DR"). Doxycycline Regular Release and Doxycycline DR are together referred to as "Doxycycline."

are based on information made public during ongoing government investigations of Defendants and other generic pharmaceutical companies for alleged unlawful price-fixing and other conduct in the generic pharmaceutical industry.

5.     Doxycycline is tetracycline antibiotic prescribed to patients for the treatment of a variety of bacterial infections. Doxycycline has been designated an essential medicine by the World Health Organization.  Doxycycline has been available in the United States for many years and the market for Doxycycline is mature.  Defendants dominate the market for Doxycycline. Doxycycline Hyclate is available in capsule or tablet form and in different formulations, including regular release and delayed release ("DR").[2]

6.     ***Doxycycline Regular Release***: At least Defendants Actavis, Sun, and West-Ward, as well as co-conspirators, engaged in an overarching anticompetitive scheme in at least the market for Doxycycline Regular Release to artificially inflate prices through unlawful agreements. Defendants caused the price of these products to dramatically and inexplicably increase as much as 7,913% higher than October 2012 prices.  The United States Government Accountability Office ("GAO") singled out Doxycycline Regular Release as an example of a generic pharmaceutical that "experienced an extraordinary price increase."[3]  This increase was the consequence of an agreement among the Defendants to increase pricing and restrain competition for the sale of Doxycycline in the United States.

7.     ***Doxycycline DR***: At least Defendants Heritage, Mayne, and Mylan, as well as co-conspirators, engaged in an overarching anticompetitive scheme to fix, maintain, and stabilize

---

[2] According to package inserts, both formulations of Doxycycline Hyclate can be used to treat the same conditions.

[3] GAO Report to Congressional Requesters, *Generic Drugs Under Medicare* (Aug. 2016), *available at* http://www.gao.gov/assets/680/679055.pdf.

prices, rig bids, and engage in market and customer allocation of at least Doxycycline DR through unlawful agreements.  The scheme caused prices of Doxycycline to be set or maintained above competitive levels.  Evidence unearthed in government investigations directly shows Defendants Heritage, Mayne, and Mylan's involvement in the Doxycycline scheme.

8. ███████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████ ██████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████

9.    Defendants' and other generic pharmaceutical manufacturers' conduct has resulted in extensive scrutiny by federal and state regulators, including by the Antitrust Division of the United States Department of Justice ("DOJ"), the United States Senate, the United States House of Representatives, and at least 45 attorneys general from 44 states and the District of Columbia (the "State AGs").  The DOJ empaneled a federal grand jury in this District, which has issued subpoenas relating to price-fixing and other anticompetitive conduct in the generic pharmaceutical industry, including to at least Defendants Actavis, Mayne, Mylan, and Sun.  As discussed below, generic Doxycycline Hyclate is known to be a focus of these investigations, which have resulted in criminal guilty pleas.

---

[4] *See* Russell Redman, *New name for Generic Pharmaceutical Association*, CHAIN DRUG REVIEW (Feb. 14, 2017), *available at* http://www.chaindrugreview.com/new-name-for-generic-pharmaceutical-association/.

10.     The DOJ's and State AG's investigations followed a congressional hearing and investigation prompted by the National Community Pharmacists Association's ("NCPA") January 2014 correspondence to the United States Senate Health Education Labor and Pensions ("HELP") Committee and the United States House Energy and Commerce Committee requesting hearings on significant spikes in generic pharmaceutical pricing.[5]  The NCPA's news release reported price hikes on essential generic pharmaceuticals exceeding 1,000% in some instances, according to its survey of over a thousand community pharmacists, resulting in some patients being forced to leave their prescriptions at the pharmacy counter due to increased copays, and forcing more seniors into Medicare's coverage gap (or "donut hole") where they must pay far higher out-of-pocket costs.

11.     On December 12 and 13, 2016, the DOJ filed its first criminal charges against Glazer and Malek in their capacities as former executives of Defendant Heritage.  *See United States of America v. Jeffrey A. Glazer*, No. 2:16-cr-00506-RBS (E.D. Pa.); *United States of America v. Jason T. Malek*, No. 2:16-cr-00508-RBS (E.D. Pa.).  The DOJ alleged that both Glazer and Malek conspired with others, including Defendants here, "to allocate customers, rig bids, and fix and maintain prices of Doxycycline Hyclate" and generic glyburide sold in the United States. Each was charged with two felony counts under the Sherman Act (15 U.S.C. §1).

12.     On January 9, 2017, Glazer and Malek pled guilty to felony charges that they conspired with competitors to manipulate prices and allocate customers for Doxycycline. Glazer admitted that:

> [He] participated in a conspiracy with other persons and entities engaged in the production and sale of generic pharmaceutical products including Doxycycline Hyclate, the primary purpose of which was to allocate

---

[5] News Release, *Generic Drug Price Spikes Demand Congressional Hearing, Pharmacists Say* (Jan. 8, 2014), *available at* http://www.ncpanet.org/newsroom/news-releases/2014/01/08/generic-drug-price-spikes-demand-congressional-hearing-pharmacists-say.

customers, rig bids and fix and maintain prices of Doxycycline Hyclate sold in the United States in furtherance of the conspiracy.

Defendant and his co-conspirators, including individuals that the defendant supervised at his company and those he reported to at his company's parent, engaged in discussions and attended meetings with the co-conspirators involved in the production and sale of Doxycycline Hyclate. During such discussions and meetings, agreements were reached to allocate customers, rig bids and fix and maintain the prices of Doxycycline Hyclate sold in the United States.[6]

13.     Malek admitted substantially the same facts.[7]   Glazer and Malek continue to cooperate with the DOJ's ongoing investigation as they await sentencing.

14.     The DOJ has publicly acknowledged that its investigation overlaps with MDL 2724 and Doxycycline specifically.  For example, the DOJ filed a motion for a stay of discovery in MDL 2724 noting that:

Evidence uncovered during the criminal investigation implicates other companies and individuals (including a significant number of the Defendants here) in collusion with respect to Doxycycline Hyclate, glyburide, and other drugs (including a significant number of the drugs at issue here).[8]

15.     Soon after the DOJ filed criminal charges, 20 state attorneys general led by the State of Connecticut also sued generic manufacturers Aurobindo, Citron, Heritage, and Teva, as well as Mayne and Mylan for bid rigging, price-fixing and market and customer allocation in connection with their sale of generic Doxycycline DR and glyburide in the United States.  On March 1, 2017, the complaint in the State AG action was amended to, *inter alia*, add claims of an additional 20 state attorneys general, bringing the total number of state AGs prosecuting the action

---

[6] Tr. of Plea Hearing at 19:16-20:4, *United States v. Glazer*, No. 16-cr-506, ECF 24 (E.D. Pa. Jan. 9, 2017); *see also id*. at 22:4-11 (admitting facts).

[7] Tr. of Plea Hearing at 19:12-20:1, *United States v. Malek*, No. 16-cr-508, ECF 24 (E.D. Pa. Jan. 9, 2017); *see also id*. at 21:23-22:6 (admitting facts).

[8] *See* Intervenor United States' Motion to Stay Discovery, *In re Generic Pharmaceuticals Pricing Antitrust Litigation*, MDL No. 2724, ECF 279 (E.D. Pa. May 1, 2017).

to 40.  Glazer and Malek entered into settlement agreements with the attorneys general on March 16, 2017.[9]   Commenting on the scope of its current antitrust investigation, the Connecticut Attorney General ("CTAG") George Jepsen stated that "[t]he issues we're investigating go *way beyond* the two drugs and six companies.  *Way beyond…We're learning new things every day*."[10] On July 17, 2017, 5 additional attorneys general joined the action by filing a nearly identical complaint and a notice of related case.[11]

16.     As a result of Defendants' schemes to fix, maintain, and stabilize prices, rig bids, and engage in market and customer allocation of Doxycycline, independent pharmacies paid, and continue to pay, supracompetitive prices for Doxycycline.

17.     Plaintiffs seek damages on behalf of themselves and members of the independent pharmacy Class caused by Defendants' and co-conspirators' violations of Section 1 of the Sherman Act, 15 U.S.C. § 1.

## II.     THE ROLE OF INDEPENDENT PHARMACIES

18.     There are approximately 22,000 privately-owned independent pharmacies in the United States, as contrasted with chain drug stores such as CVS, Walgreens, and Rite Aid, and mass merchandiser or supermarket drug stores such as Wal-Mart, Target and Kroger. Over a billion prescriptions for U.S. patients are dispensed through independent pharmacies each year.

---

[9] John Kennedy, *Ex-Heritage Execs to Help States Probe Drug Price-Fixing*, LAW360 (May 24, 2017), *available at* https://www.law360.com/competition/articles/927899/ex-heritage-execs-to-help-states-probe-drug-price-fixing?nl_pk=eb0b62b3-08e3-46ed-ac8a-7ab5fa616c07&utm_source=newsletter&utm_medium=email&utm_campaign=competition.

[10] Liz Szabo, et al., *How Martinis, Steaks, and a Golf Round Raised Your Prescription Drug Prices*, THE DAILY BEAST (Dec. 21, 2016), *available at* http://thebea.st/2haV9xg (emphasis added).

[11] *Arkansas v. Aurobindo Pharma USA, Inc.*, No. 17-cv-1180 (filed in D. Conn.).

19.     Independent pharmacies rarely purchase generic drugs directly from the manufacturer, and instead acquire drugs almost exclusively from drug wholesalers such as McKesson Corp., Cardinal Health Inc., or Amerisource Bergen Corp. As one would expect, the wholesaler's price includes a percentage markup over the manufacturer's price. Independent pharmacies, lacking the sales volume heft and wholesaler relationships enjoyed by their much larger competitors, have no meaningful ability to negotiate these acquisition costs. They must pay the price the wholesaler charges. As a result, when drug manufacturers collude to allocate customers or raise the prices of generic drugs, independent pharmacies end up paying illegally inflated prices for those drugs.

### III.     JURISDICTION AND VENUE

20.     This Court has jurisdiction over the subject matter of this action as it arises under Section 1 of the Sherman Act, 15 U.S.C. § 1, and Section 4 of the Clayton Act, 15 U.S.C. § 15. Further, this Court has jurisdiction under 28 U.S.C. §§ 1331, 1337(a).

21.     Venue is proper in this District pursuant to 15 U.S.C. §§ 15 and 22, and 28 U.S.C. § 1391(b), (c) and (d), because during the Class Period Defendants transacted business throughout the United States, including in this District; Defendants resided, transacted business, were found, or had agents within this District, and a portion of the affected interstate trade and commerce discussed below was carried out in this District.

22.     During the Class Period, Defendants sold and distributed generic pharmaceuticals in a continuous and uninterrupted flow of interstate commerce, which included sales of Doxycycline in the United States, including in this District. Defendants' conduct had a direct, substantial, and reasonably foreseeable effect on interstate commerce in the United States, including in this District.

23.     This Court has personal jurisdiction over each Defendant because, inter alia, each Defendant: (a) transacted business throughout the United States, including in this District; (b) participated in the selling and distribution of Doxycycline throughout the United States, including in this District; (c) had and maintained substantial contacts within the United States, including in this District; and/or (d) was engaged in an unlawful conspiracy to inflate the prices for Doxycycline that was directed at and had the intended effect of causing injury to persons residing in, located in, or doing business throughout the United States, including in this District.

## IV.     PARTIES

### A.     Plaintiffs

24.     Plaintiff West Val Pharmacy ("West Val") is a privately held independent pharmacy that has been in business since 1959 and is currently located at 5353 Balboa Boulevard in Encino, California. West Val Pharmacy indirectly purchased Defendants' generic Doxycycline products at supracompetitive prices during the Class Period, and was thereby injured and suffered damages as a result of Defendants' unlawful conduct.

25.     Plaintiff Halliday's & Koivisto's Pharmacy ("Halliday's") is an independent pharmacy located at 4133 University Boulevard in Jacksonville, Florida. Halliday's has served the Jacksonville community for over 50 years. Halliday's indirectly purchased Defendants' generic Doxycycline products at supracompetitive prices during the Class Period, and was thereby injured and suffered damages as a result of Defendants' unlawful conduct.

26.     Plaintiff Russell's Mr. Discount Drugs, Inc. ("Russell's") was a privately held independent pharmacy located at 334 Depot Street, in Lexington, Mississippi from the time of its opening in February 1986 until it sold the prescription drugs portion of its business to a pharmacy chain on July 14, 2016. Russell's indirectly purchased Defendants' generic Doxycycline products

at supracompetitive prices during the class period, and was thereby injured and suffered damages as a result of Defendants' unlawful conduct.

27.     Plaintiff Falconer Pharmacy, Inc. ("Falconer") is a privately held independent pharmacy located in Falconer, New York. Falconer Pharmacy indirectly purchased Defendants' generic Doxycycline products at supracompetitive prices during the Class Period, and was thereby injured and suffered damages as a result of Defendants' unlawful conduct.

28.     Plaintiff Deal Drug Pharmacy ("Deal Drug") is a privately held independent pharmacy in Nashville, Tennessee. Deal Drug indirectly purchased Defendants' generic Doxycycline products at supracompetitive prices during the Class Period, and was thereby injured and suffered damages as a result of Defendants' unlawful conduct.

29.     Plaintiff Chet Johnson Drug, Inc. ("Chet Johnson") is a privately held independent pharmacy in Avery, Wisconsin. Chet Johnson indirectly purchased Defendants' generic Doxycycline products at supracompetitive prices during the Class Period, and was thereby injured and suffered damages as a result of Defendants' unlawful conduct.

**B.     Defendants**

30.     Defendant Actavis Holdco U.S., Inc. ("Actavis") is a Delaware corporation with its principal place of business in Parsippany, New Jersey.  In August 2016, Teva Pharmaceuticals U.S., Inc. acquired Allergan plc's generics business (including Actavis).  During the Class Period, Actavis sold Doxycycline to purchasers in this District and throughout the United States.

31.     Defendant Heritage Pharmaceuticals, Inc. ("Heritage") is a Delaware corporation with its principal place of business in Eatontown, New Jersey.  Heritage is a subsidiary of Emcure Pharmaceuticals Limited, an Indian pharmaceutical company.  During the Class Period, Heritage sold Doxycycline to purchasers in this District and throughout the United States.

32.     Defendant Mayne Pharma USA, Inc. ("Mayne") is a Delaware corporation with its principal place of business in Raleigh, North Carolina.  During the Class Period, Mayne sold Doxycycline to purchasers in this District and throughout the United States.

33.     Defendant Mylan Inc. is a Pennsylvania corporation with its principal place of business in Canonsburg, Pennsylvania.

34.     Defendant Mylan Pharmaceuticals Inc. is a West Virginia corporation with its principal place of business in Morgantown, West Virginia. Mylan Inc. and Mylan Pharmaceuticals Inc. are wholly-owned subsidiaries of Mylan N.V., a Dutch pharmaceutical company.  In this complaint, Defendants Mylan Inc. and Mylan Pharmaceuticals Inc. are together referred to as "Mylan."  During the Class Period, Mylan sold Doxycycline to purchasers in this District and throughout the United States.

35.     Defendant Par Pharmaceutical, Inc. ("Par") is a New York corporation with its principal place of business in Chestnut Ridge, New York. Par is a subsidiary of Endo International plc ("Endo"), an Irish pharmaceutical company. In September 2015, Endo completed an acquisition of Par Pharmaceuticals Holdings, Inc. and its subsidiaries, including Par, from a private investment firm for about $8 billion in cash and stock. At that time Endo created a combined U.S. Generics segment that included Par, and Endo's subsidiary Qualitest, naming the segment Par Pharmaceutical, Inc. During the Class Period, Par sold Doxycycline to purchasers in this District and throughout the United States.

36.     Defendant Sun Pharmaceutical Industries, Inc. ("Sun") is a Michigan corporation with its principal place of business in Cranbury, New Jersey.  In late 2012, Sun acquired URL Pharma, Inc. ("URL") with its principal place of business in Philadelphia, PA.  URL is a wholly-owned subsidiary of Sun.  URL as a group includes five wholly-owned subsidiaries, including

Mutual Pharmaceutical Company, Inc.   During the Class Period, Sun sold Doxycycline to purchasers in this District and throughout the United States.

37.     Defendant West-Ward Pharmaceuticals Corporation ("West-Ward") is a Delaware corporation with its principal place of business in Eatontown, New Jersey.   During the Class Period, West-Ward sold Doxycycline to purchasers in this District and throughout the United States.

38.     Defendants and their officers, agents, employees, or representatives have engaged in the conduct alleged in this Complaint while actively involved in the management of Defendants' business and affairs.

## C.     Co-Conspirators

39.     Various other persons, firms, entities, and corporations, not named as defendants in this Complaint, have participated as co-conspirators with Defendants in the violations alleged herein, and have aided, abetted, and performed acts and made statements in furtherance of the conspiracy.

40.     The true names and capacities of additional co-conspirators, whether individual, corporate, associate, or representative, are presently unknown to Plaintiffs.   Plaintiffs may amend this Complaint to allege the true names and capacities of additional co-conspirators as they are discovered.

41.     At all relevant times, other persons, firms, and corporations, referred to herein as "co-conspirators," the identities of which are presently unknown, have willingly conspired with Defendants in their unlawful monopolization as described herein.

42.     The acts alleged herein that were done by each of the co-conspirators were fully authorized by each of those co-conspirators, or were ordered or committed by duly authorized

officers, managers, agents, employees, or representatives of each co-conspirator while actively engaged in the management, direction, or control of its affairs.

43.    The wrongful acts alleged to have been done by any one Defendant or co-conspirator were authorized, ordered, or done by its directors, officers, managers, agents, employees, or representatives while actively engaged in the management, direction, or control of such Defendant's or co-conspirator's affairs.

## V.    INTERSTATE TRADE AND COMMERCE

44.    Defendants are the leading manufacturers and suppliers of Doxycycline sold in the United States.

45.    Doxycycline is produced by or on behalf of Defendants or their affiliates in the United States or overseas.

46.    During the Class Period, Defendants, directly or through one or more of their affiliates, sold Doxycycline throughout the United States in a continuous and uninterrupted flow of interstate commerce, including through and into this District.

47.    The activities of Defendants and their co-conspirators were within the flow of, intended to, and had a substantial effect on interstate commerce in the United States.

48.    Defendants' and their co-conspirators' conduct, including the marketing and sale of Doxycycline, took place within, has had, and was intended to have, a direct, substantial, and reasonably foreseeable anticompetitive effect upon interstate commerce within the United States.

49.    The conspiracy alleged in this Complaint has directly and substantially affected interstate commerce in that Defendants deprived Plaintiffs of the benefits of free and open competition in the purchase of Doxycycline within the United States.

50.    Defendants' agreement to fix, maintain, and stabilize prices, rig bids, and engage in market and customer allocation of Doxycycline, and their actual inflating, fixing, raising,

maintaining, or artificially stabilizing Doxycycline prices, were intended to have, and had, a direct, substantial, and reasonably foreseeable effect on interstate commerce within the United States.

## VI.   FACTUAL ALLEGATIONS

**A.   The generic drug market is a commodities market, where competition historically has been keen.**

51.     Approximately 88% of all pharmaceutical prescriptions in the United States are filled with a generic drug.[12]   In 2015, generic drug sales in the United States were estimated at $74.5 billion.[13]

52.     According to the U.S. Food & Drug Administration ("FDA"), a generic drug is "the same as a brand name drug in dosage, safety, strength, how it is taken, quality, performance, and intended use."[14]   Once the FDA approves a generic drug as "therapeutically equivalent" to a brand drug, the generic version "can be expected to have equal effect and no difference when substituted for the brand name product."[15]

53.     In a competitive market, generic drugs cost substantially less than branded drugs. The U.S. Congressional Budget Office ("CBO") estimates that, "[o]n average, the retail price of a generic drug is 75 percent lower than the retail price of a brand-name drug."[16]   And that may be conservative.   According to a Federal Trade Commission ("FTC") study, in a "mature generic

---

[12] GPhA, *Generic Drug Savings in the U.S.* (2015) ("GPhA Report") at 1, *available at* http://www.gphaonline.org/media/wysiwyg/PDF/GPhA_Savings_Report_2015.pdf

[13] Connecticut AG, Press Release (Dec. 15, 2016), *available at* http://www.ct.gov/ag/cwp/view.asp?Q=588538&A=2341

[14] FDA Website, *available at* http://www.fda.gov/Drugs/InformationOnDrugs/ucm079436.htm#G

[15] *Id.*

[16] CBO, *Effects of Using Generic Drugs on Medicare's Prescription Drug Spending* (Sep. 15, 2010), *available at* https://www.cbo.gov/publication/21800

market, generic prices are, on average, 85% lower than the pre-entry branded drug price."[17]
Mature generic markets—like that of Doxycycline—typically have several manufacturers that
compete for sales, hence keeping prices in check.

54.     Generic drug price competition provides enormous savings to consumers,
pharmacies, and other drug purchasers, as well as to private health insurers, health and welfare
funds, and state Medicaid programs.  Indeed, one study found that the use of generic medicines
saved the United States healthcare system $254 billion in 2014 alone, and $1.68 trillion between
2005 and 2014.[18]

55.     The significant cost savings provided by generic drugs motivated Congress to enact
the Drug Price Competition and Patent Term Restoration Act of 1984, more commonly known as
the "Hatch-Waxman Act" (Pub. L. No. 98-417, 98 Stat. 1585).  The Act streamlines the regulatory
hurdles that generic drug manufacturers have to clear prior to marketing and selling generic drugs.
Generic drug manufacturers may obtain FDA approval in an expedited fashion through the filing
of an Abbreviated New Drug Application ("ANDA") that establishes that its product is
bioequivalent to the branded counterpart.

56.     Since passage of the Hatch-Waxman Act, every state has adopted substitution laws
requiring or permitting pharmacies to substitute generic drug equivalents for branded drug
prescriptions (unless the prescribing physician specifically orders otherwise by writing "dispense
as written" or similar language on the prescription).

57.     Because each generic is readily substitutable for another generic of the same brand
drug, pricing is the main differentiating feature.  As recognized by the FTC, "generic drugs are

---

[17] FTC, *Pay-For-Delay: How Drug Company Pay-offs Cost Consumers Billions* (Jan.
2010), *available at* http://www.ftc.gov/os/2010/01/100112payfordelayrpt.pdf
[18] GPhA Report at 1.

commodity products" and, as a consequence of that, are marketed "primarily on the basis of price."[19]  In a competitive market, generic manufacturers cannot significantly increase prices (or maintain high prices in the face of a competitor's lower price) without losing a significant volume of sales.

58.    It is well-established that competition among generic manufacturers drives down price.  Before generic drugs enter a market, the brand drug has a monopoly and captures 100% of sales.  When lower-priced generics become available, the brand drug quickly loses market share as purchasers switch to the cheaper alternatives.  Over time, the price of a generic drug approaches the manufacturers' marginal costs.  As illustrated in the following chart, the price of a generic drug tends to decrease as more generic drug manufacturers enter the market:

**Generic Competition and Drug Prices**



Source:  FDA analysis of retail sales data from IMS Health, IMS National Sales Perspective (TM), 1999-2004, extracted February 2005

59.    When new entrants join a competitive generic market, they typically will price their product below the prevailing market price in order to gain market share.  A recent government report confirmed this phenomenon in interviews with generic manufacturers: "manufacturers said

---

[19] FTC, *Authorized Generic Drugs: Short-Term Effects and Long-Term Impact* (Aug. 2011), *available at* http://www.ftc.gov/os/2011/08/2011genericdrugreport.pdf

that if a company is bringing a generic drug into an established drug market, it typically offers a price that is lower than the current market price in order to build its customer base.  Manufacturers also said that as each new manufacturer enters an established generic drug market the price of that generic will fall, with one manufacturer noting that it is typically a 20 percent price decline per entrant."[20]

60.     When there are multiple generic manufacturers in an established generic market—as with generic Doxycycline—prices should remain low and stable, and should not increase absent a market disruption or, as is the case here, anticompetitive conduct.

**B.     Pricing of generic drugs discourages unilateral price increases**

61.     Ordinarily, the price for a consumer product is set by the retailer based on the amount the typical consumer is willing to pay.  But because of the unique features of the prescription drug marketplace, prescription drug pricing for most consumers is not determined between the retailer and the consumer.  Rather, because most prescription drug purchases are reimbursed by some form of health insurance, the pricing for prescription drugs is determined by reimbursement agreements between these prescription drug payors, i.e., health plans and their prescription benefit managers, and the pharmacies.

62.     Maximum Allowable Cost caps ("MACs") are the maximum amount that a payor will reimburse a pharmacy for a given strength and dosage of a generic drug or brand drug that has a generic version available.  A MAC price thus represents the upper limit that a prescription drug payor will pay a pharmacy for a generic drug.

---

[20] GAO Report at 23.

63.     Payors set the MAC pricing of a drug according to a formula based on a variety of factors, including, most significantly, the lowest acquisition cost for each generic drug paid by retail pharmacies for each of a drug's generic versions.

64.     MAC pricing is designed to incentivize pharmacies to purchase the least costly version of a generic drug available on the market, without regard to the manufacturer's list price. Because the reimbursement amount to a pharmacy is limited by the MAC price for a generic drug and each of its equivalents regardless of the pharmacy's acquisition cost, a pharmacy's profit will be reduced, or lost altogether, if it purchases other than the lowest cost generic product.

65.     MAC pricing also incentivizes an individual generic manufacturer to refrain from unilaterally increasing its prices.  Because MAC pricing bases reimbursement partly on the generic drug's lowest acquisition cost, a generic manufacturer that increases its price for a drug would expect that it would lose sales to a competing generic manufacturer whose price is not increased.

66.     Consequently, in the absence of coordinated pricing activity among generic manufacturers, an individual generic manufacturer cannot significantly increase its price (or maintain high prices in the face of a significantly lower competitor price) without incurring the loss of a significant volume of sales.

**C.     Defendants conspired to, among other things, fix Doxycycline prices.**

67.     On January 9, 2017, former Defendant Heritage executives Glazer and Malek entered guilty pleas admitting that they have "participated in a conspiracy with other persons and entities engaged in the production and sale of generic pharmaceutical products, including Doxycycline Hyclate, the primary purposes of which was to allocate customer, rig bids and fix and maintain prices of Doxycycline Hyclate sold in the United States in furtherance of the conspiracy." Glazer and Malek further admitted that they "attended meetings with the co-conspirators involved in the production and sale of Doxycycline Hyclate" and that during these meetings "agreements

- 17 -

were reached to allocate customers, rig bids and fix and maintain the prices of Doxycycline Hyclate sold in the United States."

68.     The DOJ's grand jury, which is empaneled in this District, is known to have subpoenaed, among others, Defendants Actavis, Heritage, Mayne, Mylan, and Sun.

69.     The State AGs have also filed suit stating:

> In July 2014, the State of Connecticut initiated a non-public investigation into suspicious price increases for certain generic pharmaceuticals. The information developed through that investigation, which is still ongoing, uncovered evidence of a broad, well-coordinated and long-running series of schemes to fix the prices and allocate markets for a number of generic pharmaceuticals in the United States. In this initial civil action, the Plaintiff States charge the Defendants with entering into contracts, combinations and conspiracies that had the effect of unreasonably restraining trade, artificially inflating and maintaining prices and reducing competition in the markets for Doxycycline Hyclate Delayed Release ("Doxy DR") and Glyburide in the United States.[21]

70.     The DOJ and State AG investigations are ongoing.


1.     **Doxycycline Regular Release**

  a.     **Defendants' dominance over Doxycycline Regular Release sales permitted them to fix prices, rig bids, and engage in market and customer allocation, and their abrupt price increases are otherwise inexplicable.**

71.     The market for Doxycycline Regular Release is mature, as generic versions have been on the market for years. In 2013 alone, Defendants Actavis, Sun, and West-Ward's total revenue from sales of Doxycycline Regular Release was approximately $966 million.[22] This compares to only approximately [redacted] in 2011, a year before the price-fixing conspiracy.

---

[21] Amended Complaint (Public Version) ¶1, *Connecticut v. Aurobindo Pharma USA, Inc.*, No. 16-cv-2056, ECF 168 (D. Conn.), *available at* http://www.ct.gov/ag/lib/ag/press_releases/2016/20161215_gdms_complain.pdf.

[22] Revenue, unit sales, and effective prices are obtained from QuintilesIMS Inc. ("IMS Health"). IMS Health is the largest vendor of physician prescribing data in the United States and

72.     A mature generic market, such as the market for Doxycycline, has several generic competitors.  As noted above, because each generic is readily substitutable for another generic of the same brand drug, the products behave like commodities, with pricing being the main differentiating feature and the basis for competition among manufacturers.  In a market free from collusive activity, over time, generics' pricing would naturally near (and stay near) the generic manufacturers' marginal costs.

73.     At all times relevant for this lawsuit, there have been multiple manufacturers of Doxycycline Regular Release.  Under accepted economic principles of competition, when there are multiple generics prices should remain at very competitive, historic levels, and would not increase as they did here absent anticompetitive conduct.  Drastic increases in generic Doxycycline Regular Release prices are themselves suggestive of Defendants' collective dominance: if they did not already dominate the market, pricing excesses would be disciplined by losing market share to non-colluding competitors.

> **b.     Defendants' collective market dominance permitted them to collude.**

74.     During the Class Period, Defendants Actavis, Sun, and West-Ward dominated Doxycycline Regular Release sales with about an [redacted] share.

75.     [redacted]

> **c.     Defendants' effective prices were remarkably stable before skyrocketing in the Class Period.**

76.     Before the Class Period, the effective prices of Defendants' Doxycycline Regular Release remained stable for years, as is typical in a mature market.  From May 2010 through

---

is widely relied upon in the pharmaceutical industry and elsewhere.  "Effective prices" represent actual transaction prices, as reported by IMS Health.

October 2012, *i.e.*, for over two years leading up to the price-fixing conspiracy, the prices for Doxycycline Regular Release were remarkably stable.

77.    Defendants' price hikes are further illustrated in the following IMS charts showing the monthly price per unit for 50 mg and 100 mg capsules of doxycycline hyclate manufactured and/or distributed by Defendants Actavis, Mylan, Westward, and Sun (Mutual) and by Qualitest (predecessor in interest of Defendant Par). Defendants' effective prices inexplicably increased sharply beginning in November 2012:


[chart redacted]


[chart redacted]

78.     The following IMS chart shows the monthly price per unit for 100 mg doxycycline hyclate tablets manufactured and/or distributed by defendants Actavis, Mylan, Westward, and Sun (Mutual) and by Qualitest, the predecessor in interest of Defendant Par.

[chart redacted]

79.     These charts are offered as examples. As noted above, the price increases affected a variety of dosages of doxycycline in both capsule and tablet form.

80.     **Sun**: For over two years before the Class Period began, the average effective price per unit of Sun's products was [redacted], [redacted], and [redacted] for its 50 mg capsule; 100 mg capsule, and 100 mg tablet respectively.

81.     In October 2012, Sun's effective prices were essentially the same.  But in November 2012, it began a drastic increase of its effective prices:

| Product | Price Oct. 2012 | Hike Date | Hike Price | Percentage Increase[23] |
|---------|-----------------|-----------|------------|-------------------------|
| CAP 50 MG | [redacted] | [redacted] | [redacted] | [redacted] |
| CAP 100 MG | [redacted] | [redacted] | [redacted] | [redacted] |
| TAB 100 MG | [redacted] | [redacted] | [redacted] | [redacted] |

82.     Sun's effective prices would continue to climb, peaking a year later, increasing as much as [redacted] above its pre-conspiracy price levels:

| Product | Price Date | Peak Price | Percentage Increase |
|---------|-----------|------------|---------------------|
| CAP 50 MG | [redacted] | [redacted] | [redacted] |
| CAP 100 MG | [redacted] | [redacted] | [redacted] |
| TAB 100 MG | [redacted] | [redacted] | [redacted] |

83.     Even today, Sun's effective prices remain unexpectedly high and would not have remained so high but for the price-fixing conspiracy.  For example, in April 2016, its effective prices were as much as [redacted] higher than in October 2012:

| Product | Price Oct. 2012 | Price Apr. 2016 | Percentage Increase |
|---------|-----------------|-----------------|---------------------|
| CAP 50 MG | [redacted] | [redacted] | [redacted] |
| CAP 100 MG | [redacted] | [redacted] | [redacted] |
| TAB 100 MG | [redacted] | [redacted] | [redacted] |

84.     **West-Ward**: For over two years before the Class Period began, the average effective price per unit of West-Ward's products was [redacted], [redacted], and [redacted] for its 50 mg capsule; 100 mg capsule, and 100 mg tablet respectively.

---

[23] Effective prices are calculated to six decimals; for ease of reference, prices in this complaint are rounded to the nearest cent.  However, percentage increases are calculated based on the more precise calculated price (*i.e.*, the number defined by as many as six decimals).

85.    [redacted]

| Product | Price Oct. 2012 | Hike Date | Hike Price | Percentage Increase |
|---------|-----------------|-----------|------------|---------------------|
| CAP 50 MG | [redacted] | [redacted] | [redacted] | [redacted] |
| CAP 100 MG | [redacted] | [redacted] | [redacted] | [redacted] |
| TAB 100 MG | [redacted] | [redacted] | [redacted] | [redacted] |

86.    West-Ward's effective prices would continue to climb, peaking the next year, increasing as much as [redacted] above its pre-conspiracy price levels:

| Product | Price Date | Peak Price | Percentage Increase |
|---------|-----------|------------|---------------------|
| CAP 50 MG | [redacted] | [redacted] | [redacted] |
| CAP 100 MG | [redacted] | [redacted] | [redacted] |
| TAB 100 MG | [redacted] | [redacted] | [redacted] |

87.    Even today, West-Ward's effective prices remain unexpectedly high and would not have remained so high but for the price-fixing conspiracy.  For example [redacted]:

| Product | Price Oct. 2012 | Price Apr. 2016 | Percentage Increase |
|---------|-----------------|-----------------|---------------------|
| CAP 50 MG | [redacted] | [redacted] | [redacted] |
| CAP 100 MG | [redacted] | [redacted] | [redacted] |
| TAB 100 MG | [redacted] | [redacted] | [redacted] |

88.    **Actavis**: For over two years before the Class Period began, the average effective price per unit of Actavis' products was [redacted], [redacted], and [redacted] for its 50 mg capsule; 100 mg capsule, and 100 mg tablet respectively.

89.    [redacted]:

| Product | Price Oct. 2012 | Hike Date | Hike Price | Percentage Increase |
|---|---|---|---|---|
| CAP 50 MG | [redacted] | [redacted] | [redacted] | [redacted] |
| CAP 100 MG | [redacted] | [redacted] | [redacted] | [redacted] |
| TAB 100 MG | [redacted] | [redacted] | [redacted] | [redacted] |

90.     [redacted]:

| Product | Price Date | Peak Price | Percentage Increase |
|---|---|---|---|
| CAP 50 MG | [redacted] | [redacted] | [redacted] |
| CAP 100 MG | [redacted] | [redacted] | [redacted] |
| TAB 100 MG | [redacted] | [redacted] | [redacted] |

91.     [redacted]:

| Product | Price Oct. 2012 | Price Apr. 2016 | Percentage Increase |
|---|---|---|---|
| CAP 50 MG | [redacted] | [redacted] | [redacted] |
| CAP 100 MG | [redacted] | [redacted] | [redacted] |
| TAB 100 MG | [redacted] | [redacted] | [redacted] |

**d.     As part of the conspiracy, Defendants increased their WAC benchmarks exorbitantly within weeks of each other.**

92.     Although MAC pricing caps has been implemented to discourage unilateral price increases of generic drugs by setting an upper limit, an individual manufacturer's WAC increase may influence the actual prices paid by independent pharmacies.  This is the case here, where Defendants Actavis, Sun, Par and West-Ward dominate Doxycycline Regular Release sales. [redacted]:[24]

---

[24] For ease of reference, WAC prices are rounded to the nearest cent, but the percentage increases are calculated on the actual reported WACs.

| Product | Defendant | NDC | Old WAC | New WAC | Date of Increase | Percentage increase |
|---|---|---|---|---|---|---|
| 50 mg cap, 50 ct. | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| 50 mg cap, 50 ct. | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| 50 mg cap, 50 ct. | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| 50 mg cap, 500 ct. | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |

93.     In the same two-week period, Defendants also increased their WACs on their 100 mg capsules and 100 mg tablets by as much as [redacted]

| Product | Defendant | NDC | Old WAC | New WAC | Date of Increase | Percentage increase |
|---|---|---|---|---|---|---|
| 100 mg cap, 50 ct. | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| 100 mg cap, 50 ct. | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| 100 mg cap, 50 ct. | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |

| Product | Defendant | NDC | Old WAC | New WAC | Date of Increase | Percentage increase |
|---|---|---|---|---|---|---|
| 100 mg cap, 500 ct. | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| 100 mg cap, 500 ct. | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| 100 mg cap, 500 ct. | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |

| Product | Defendant | NDC | Old WAC | New WAC | Date of Increase | Percentage increase |
|---|---|---|---|---|---|---|
| 100 mg tab, 50 ct. | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| 100 mg tab, 50 ct. | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |

| Product | Defendant | NDC | Old WAC | New WAC | Date of Increase | Percentage increase |
|---|---|---|---|---|---|---|
| 100 mg tab, 500 ct. | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| 100 mg tab, 500 ct. | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |

**e.    Whatever shortages or other market changes may have occurred during the Class Period, they alone cannot have caused the extraordinary price increases.**

94.    Federal law requires mandatory drug shortage reporting for drug manufacturers.[25] The FDA originally reported a shortage of some forms of Doxycycline Hyclate on January 18, 2013, and continued to report in mid-2013 shortage from some, but not all, manufacturers of some dosages and forms of Doxycycline Hyclate.[26]  Some of the Doxycycline Regular Release products also appear on archived lists of the American Society of Health-System Pharmacists ("ASHP") Current Shortage Bulletins during the Class Period.  However, these statements are not inconsistent with Defendants' price collusion.

**f.    Reported "shortages" do not correlate with reduced sales.**

95.    ASHP did not report any shortages of Actavis' 100 mg tablets, but in December 2012, May 2013, July 2013, January 2014, March 2014, June 2014, and July 2014, it reported

---

[25] FDA Safety and Innovation Act of 2012, Pub. L. No. 112-144, §§ 1001-1008, 126 STAT. 995, 1099-1108.

[26] CDC Health Advisory (June 12, 2013), *available at* https://emergency.cdc.gov/han/han00349.asp.

shortages of Actavis' 50 mg and 100 mg capsules.[27]  By January 14, 2015, ASHP described the shortage "resolved,"[28] and on May 18, 2015, it listed Actavis' 50 mg and 100 mg capsules as "available."[29]  Actavis communicated with ASHP that the reason for its purported capsule shortages was "supply and demand."[30]  Despite its reported capsule "shortages," Actavis' 2013 capsule sales increased.  Relative to 2012, its sales of 50 mg capsules also increased in 2014, meanwhile its tablets, which were never reported in short supply, decreased in 2014 by [redacted].  That sales increased during the purported shortage and decreased when drugs were available, undermines any claim that shortages caused Actavis' price increases.

96.      In December 2012, May 2013, and July 2013, ASHP reported shortages of Sun's 50 mg and 100 mg capsules and 100 mg tablets.[31]  By January 2014, all three products were listed as "available."[32]  According to Sun (formerly Mutual), the shortages were the result of an unspecified "raw material shortage."[33]  Archived ASHP lists indicate that Sun was the only manufacturer of Doxycycline tablets and capsules to make this claim.  Despite its reported "shortages" in 2013, Sun actually increased the number of 50 mg and 100 mg capsules sold that year by [redacted] and [redacted] respectively.  Still more unexpected, Sun's 2014 sales (*i.e.*, post-shortage) of its 50 mg capsules, 100 mg capsules and 100 mg tablets *decreased* by [redacted], [redacted] and [redacted] respectively relative to 2013.  That its sales volume increased during the

---

[27] ASHP, Current Drug Shortage Bulletin: Doxycycline Capsules and Tablets ("Current Drug Shortage Bulletin") (December 10, 2012; May 20, 2013; July 10, 2013; January 15, 2014; March 6, 2014; June 23, 2014; and July 18, 2014).

[28] ASHP, Current Drug Shortage Bulletin (January 14, 2015).

[29] ASHP, Current Drug Shortage Bulletin (May 18, 2015).

[30] ASHP, Current Drug Shortage Bulletin (July 18, 2014) n.8.

[31] ASHP, Current Drug Shortage Bulletin (December 10, 2012; May 20, 2013; July 10, 2013).

[32] ASHP, Current Drug Shortage Bulletin (January 15, 2014).

[33] ASHP, Current Drug Shortage Bulletin (July 10, 2013), at n.4.

purported shortage and decreased when its drugs became available, undermines any claim that shortages caused Sun's price increases.

97.     ASHP reported shortages of West-Ward's 50 mg capsules and of certain bottle sizes of its 100 mg capsules and tablets in December 2012.[34]  By May 2013, all three products were reported as "available" again, although West-Ward discontinued its 20 count bottle of 100 mg capsules.[35]   Notably, ASHP reported that West-Ward "could not provide a reason for the shortage."[36]  Remarkably, given that its pills were in supply by mid-2013 forwards, West-Ward's sales declined in both 2013 and 2014, undermining any claim that shortages caused West-Ward's price increases.

98.     Revenue for Doxycycline Regular Release skyrocketed, a feat Defendants could not have accomplished absent collusion.   Between 2012 and 2013, Defendant Sun's revenue increased [redacted]; Defendant Actavis' revenue increased [redacted]; and West-Ward's revenue increased [redacted].

99.     Nor does any change in the marketplace explain the rising prices—before the Class Period, from 2010 to 2013, Defendants Actavis, Sun, and West-Ward accounted for roughly [redacted] of the direct sales of Doxycycline Regular Release, and the prices and respective market shares of competitors remained relatively constant at these levels.   During the Class Period, Defendants Actavis, Sun, and West-Ward maintained about an [redacted] of Doxycycline Regular Release sales.

---

[34] ASHP, Current Drug Shortage Bulletin (December 10, 2012).

[35] ASHP, Current Drug Shortage Bulletin (May 20, 2013).

[36] ASHP, Current Drug Shortage Bulletin (December 10, 2012).

2.     **Doxycycline DR**

a.     **Defendants' dominance over Doxycycline DR sales permitted them to fix, maintain, and stabilize prices, rig bids, and engage in market and customer allocation.**

100.    Before the Doxycycline DR Class Period, Mylan was the only manufacturer of generic Doxycycline DR and had [redacted] of generic sales.  In 2012 alone, Mylan's total revenue from these products was approximately [redacted].  Remarkably, despite the entry of Defendants Heritage and Mayne with Doxycycline DR, Mylan's revenue in 2013 increased to [redacted] and its effective price remained more or less the same through mid-2014 despite its competition.

101.    As noted above, because each generic is readily substitutable for another generic of the same brand drug, the products behave like commodities, with pricing being the main differentiating feature and the basis for competition among manufacturers.  In a market free from collusive activity, over time, generics' pricing would naturally near (and stay near) the generic manufacturers' marginal costs.  Further, in a market free from collusive activity, the entry of a new competitor into a single player space, such as Mylan with Doxycycline DR, would result in lower prices.

102.    But Doxycycline DR prices remained higher than expected despite the new entrants.  This was a result of a collusive agreement among at least Defendants Heritage and Mylan (and, later, Mayne) to fix, maintain, and stabilize prices, rig bids, and engage in market and customer allocation concerning at least Doxycycline DR.  As described below, Heritage reached out to Mylan before beginning sales of Doxycycline DR to reach agreement to avoid competing on Doxycycline DR.

b.     **The Doxycycline DR scheme.**

103.    Evidence unearthed in the State AG investigation shows that Defendants Heritage, Mayne, and Mylan routinely sought out their competitors in an effort to reach agreement to engage

in market and customer allocation, maintain high prices, and avoid competing on price.  This agreement had the effect of artificially maintaining high prices for a large number of generic drugs, including Doxycycline DR, and creating an appearance of competition when in fact none existed.

104.    In 2013 and 2014, Malek, then-President of Defendant Heritage, and Glazer, then-CEO and Chairman of Heritage, compiled a large list of generic drugs, including Doxycycline DR, and instructed employees to contact competitors to reach agreement to fix prices and allocate customers.  Malek was responsible for contacting Defendant Mylan and did so with respect to a number of drugs, including Doxycycline DR.  Heritage employees also contacted competitors and reached agreements to fix, maintain, and stabilize the prices, rig bids, and allocate market and customers for Doxycycline DR, as well as other generic drugs.

105.    In May 2013, as Heritage was gearing up to launch Doxycycline DR, Heritage (through at least Glazer and Malek) engaged in communications with various executives at Mylan, which was then the only manufacturer of Doxycycline DR.  For example, Malek asked another executive at Heritage to set up a call between Malek and the Vice President of Sales at Mylan, Bob Potter ("Potter").  Malek and Potter frequently attended the same industry events.  For example, both attended the NACDS Store Expo held every August throughout the Class Period.  The other Heritage executive recommended that Malek contact Jan Bell ("Bell") Director, National Accounts at Mylan.  Malek promptly connected with Bell through the website LinkedIn.  Malek and Bell communicated by phone on multiple occasions and continued to communicate about various drugs including Doxycycline DR.  Also in May 2013, Glazer emailed another executive at Mylan.  That Mylan executive responded with a phone number where he could be reached in England, and the two spoke the next day.

106.     During the course of these and other communications, Heritage and Mylan executives agreed to allocate market and customers, coordinate on bidding for customers, and otherwise refrain from competing with one another concerning Doxycycline DR.  The objective was to avoid competition on pricing that would reduce profitability for both companies.  Heritage executives made clear that the purpose of the agreement was to maintain prices.

107.     Defendant Mayne launched Doxycycline DR in February 2014 and, just as Heritage had done with Mylan before launching Doxycycline DR, Mayne approached Heritage before beginning sales about obtaining market share and refraining from competition.  For example, in January 2014, the month before Mayne entered, a Mayne employee and a Heritage employee spoke by phone.

108.     Heritage, Mylan, and Mayne ultimately reached agreement to fix, maintain, and stabilize prices, rig bids, and allocate customers for Doxycycline DR.   For example, Heritage and Mayne began coordinating on bidding.  In January 2015, Econdisc Contracting Solutions, a large group purchasing organization, sought bids for Doxycycline DR, and Heritage made sure to bid a higher price than Mayne in accordance with the agreement not to compete.  In September 2015, Heritage also refused to provide a Doxycycline DR bid to a large pharmacy chain, because the incumbent supplier was Mayne.

109.     The State AGs have uncovered other specific instances of anticompetitive activity among Defendants Heritage, Mayne, and Mylan, including, but not limited to:

- An instance where Mylan agreed to "walk away" from large orders and allow Heritage to obtain the business and increase its market share.

- An instance in November 2013 where Heritage and Mylan discussed the fact that the purpose of their agreement was to maintain high prices and ensured that both companies were committed to that goal.

- An instance in February 2014 where Mayne approached Heritage to discuss engaging in market and customer allocation concerning Doxycycline.

- Instances in early to mid-2014 where Heritage and Mayne engaged in bid rigging related to Doxycycline DR.

- An instance in August 2014 where Heritage communicated with Mylan concerning their agreement to fix prices.

- An instance in November 2014 where Heritage and Mayne engaged in bid rigging related to Doxycycline DR.

- An instance in December 2014 where Heritage and Mayne employees met at a trade association conference to discuss their illegal agreement.

- An instance in December 2014 where Mayne followed through on its agreement with Heritage to rig bids on Doxycycline DR.

- An instance in December 2015 where Heritage and Mayne engaged in bid rigging related to Doxycycline DR.

110.    In addition to these specific instances, as described below, Defendants Heritage (and its former executives Glazer and Malek) and Mylan frequently attended industry meetings and other events, which Defendants Actavis, Mayne, Sun, and West-Ward also attended.

**D.    Defendants orchestrated their collusion through in-person meetings at trade association meetings, industry meetings, and other events.[37]**

111.    During the Class Period, Defendants conspired, combined, and contracted to fix, raise, maintain, and stabilize prices, rig bids, and engage in market and customer allocation concerning Doxycycline, which had the intended and actual effect of causing Plaintiffs and the other members of the proposed Class to pay artificially inflated prices above prices that would exist if a competitive market had determined prices for Doxycycline.

---

[37]  ████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████

112. ███████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████.

113.     In formulating and effectuating their conspiracy, Defendants engaged in numerous anticompetitive activities, including, among other things:

(a)     Participating, directing, authorizing, or consenting to the participation of subordinate employees in meetings, conversations, and communications with co-conspirators to discuss the sale and pricing of Doxycycline in the United States;

(b)     Participating, directing, authorizing, or consenting to the participation of subordinate employees in meetings, conversations, and communications with co-conspirators to engage in market and customer allocation or bid rigging for Doxycycline sold in the United States;

(c)     Agreeing during those meetings, conversations, and communications to engage in market and customer allocation or bid rigging for Doxycycline sold in the United States;

(d)     Agreeing during those meetings, conversations, and communications not to compete against each other for certain customers for Doxycycline sold in the United States;

(e)     Submitting bids, withholding bids, and issuing price proposals in accordance with the agreements reached;

(f)     Selling Doxycycline in the United States at collusive and noncompetitive prices; and

(g)     Accepting payment for Doxycycline sold in the United States at collusive and noncompetitive prices.

114.     To sustain a conspiracy, conspirators often communicate to ensure that all are adhering to the collective scheme.  Here, such communications occurred primarily through (1) trade association meetings and conferences, (2) private meetings, dinners, and outings among

smaller groups of employees of various generic drug manufacturers, and (3) individual private communications between and among Defendants' employees through use of the phone, electronic messaging and similar means.

115.   These secret, conspiratorial meetings, discussions, and communications helped to ensure that all Defendants agreed to participate in, implement, and maintain an unlawful bid rigging, price-fixing, and market and customer allocation scheme.

116.   The industry intelligence-gathering reporting firm *Policy and Regulatory Report* has reportedly obtained information regarding the investigation of generic drug companies by the DOJ, and has indicated that the DOJ is investigating the extent to which trade associations and industry conferences have been used as forums for collusion among competing generic drug companies.[38]   The State AGs have similarly noted the centrality of trade associations and industry conferences in their investigation stating that they have uncovered evidence that certain generic drug companies "routinely coordinated their schemes through direct interaction with their competitors at industry trade shows, customer conferences, and other events, as well as through direct email, phone, and text message communications."[39]

117.   ███████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

---

[38] Eric Palmer, *Actavis gets subpoena as DOJ probe of generic pricing moves up food chain*, FIERCEPHARMA (Aug. 7, 2015), *available at* http://www.fiercepharma.com/story/actavis-gets-subpoena-doj-probe-generic-pricing-moves-food-chain/2015-08-07.

[39] CTAG Website, Press Release, *40 State Attorneys General Now Plaintiffs in Federal Generic Drug Antitrust Lawsuit* (Mar. 1, 2017), *available at* http://www.ct.gov/ag/cwp/view.asp?Q=588538&A=2341.

███████████████████████████████████████████████

███████████████████████████████████

118.    The GPhA (now called the Association for Accessible Medicines) is the "leading trade association for generic drug manufacturers."[40]  GPhA was formed in 2000 from the merger of three industry trade associations: the Generic Pharmaceutical Industry Association, the National Association of Pharmaceutical Manufacturers, and the National Pharmaceutical Alliance.

119.    GPhA's website touts, "[b]y becoming part of GPhA, you can participate in shaping the policies that govern the generic industry" and lists its "valuable membership services, such as business networking opportunities, educational forums, access to lawmakers and regulators, and peer-to-peer connections."[41]  GPhA's "member companies supply approximately 90 percent of the generic prescription drugs dispensed in the U.S. each year."

120.    Several of Defendants' high-ranking corporate officers have served on GPhA's Board of Directors before and during the Class Period:

    a.    **2012 Board of Directors**: Tony Mauro, President of Mylan North America; Dou Boothe, President and CEO, Actavis, Inc.,  Jeffrey Glazer, CEO of Heritage;

    b.    **2013 Board of Directors:** Tony Mauro, President of Mylan North America; Charlie Mayr, Chief Communications Officer – Global, Actavis, Inc.; Jeffrey Glazer, CEO of Heritage;

    c.    **2014 Board of Directors:** Jeffrey Glazer, CEO of Heritage; Tony Mauro, President of Mylan North America;

    d.    **2015 Board of Directors:** Jeffrey Glazer, CEO of Heritage; Marcie McClintic Coates, VP & Head of Global Regulatory Affairs for Mylan; and

---

[40] Ass'n for Accessible Medicines, *The Association*, *available at* http://www.gphaonline.org/about/the-gpha-association.

[41] Ass'n for Accessible Medicines, *Membership*, *available at* http://www.gphaonline.org/about/membership.

e.     **2016 Board of Directors:** Heather Bresch, CEO of Mylan; and Jeffrey Glazer, CEO of Heritage.

121.    Defendants Actavis, Heritage, Mylan, Sun, and West-Ward were regular members of the GPhA during the Class Period.  Regular members "are corporations, partnerships or other legal entities whose primary United States business derives the majority of its revenues from sales of (1) finished dose drugs approved via ANDAs; (2) products sold as authorized generic drugs; (3) biosimilar/biogeneric products; or (4) DESI products."[42]

122.    The NACDS is a national trade association representing chain community pharmacies.  Its members include generic drug manufacturers, wholesalers, and retail chain pharmacies. NACDS holds regular industry events, including annual and regional conferences, which Defendants and other generic drug manufacturers attended, including the annual Total Store Expo.

123.    ████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████  ██████████████████████
████████████████████████████████████████████████████████
██████████████████████  ███████████████████████████████████
████████████████████████████

124.    According to its website, MMCAP is a "free, voluntary group purchasing organization for government facilities that provide healthcare services.  MMCAP has been delivering pharmacy and healthcare value to members since 1985.  MMCAP's membership extends across nearly every state in the nation, delivering volume buying power.  Members receive

---

[42] *Id.*
[43] ███████████████████████████████████████████████████.

access to a full range of pharmaceuticals and other healthcare products and services; such as, medical supplies, influenza vaccine, dental supplies, drug testing, wholesaler invoice auditing and returned goods processing."

125.   MMCAP's Charter provides that "[i]n 1989, the Minnesota Department of Administration, an agency of the State of Minnesota, began a cooperative purchasing venture program to procure pharmaceutical products at the best price possible for the benefit of any other state interested in participating in the program . . . In 1996, the cooperative purchasing venture was named Minnesota Multistate Contracting Alliance for Pharmacy . . . and currently provide healthcare-related contracting to state and local government members located across the United State of America.  Total purchasers by MMCAP member facilities for all MMCAP programs exceed $1 billion annually . . . ."

126.   ███████████████████████████████████████████
███████████████████████████████████████████
████████████████████████████.

127.   ███████████████████████████████████████████
███████████████████████████████████████████
████████████████████████████.

128.   ███████████████████████████████████████████
███████████████████.

129.   ███████████████████████████████████████████
███████████████████████████████████████████████
█████████████████████████████████████████.

130.     On October 1-3, 2012, GPhA held a meeting in Bethesda, Maryland that was attended by representatives from Defendants Actavis, Heritage, Sun, and Mylan.

131.     On February 20-22, 2013, GPhA held a meeting in Orlando, Florida that was attended by representatives from Defendants Actavis, Heritage, and Mylan.

132.     [redacted]

133.     On April 20-23, 2013 NACDS held its 2013 Annual Meeting at the Sands Expo Convention Center in Palm Beach, Florida. NACDS's  2013 Annual Meeting was attended by representatives from Defendants, who were key executives for generic drug sales and pricing:[44]

a.     **Actavis:** Andrew Boyer, President & CEO, North America Generics; Sigurdur Olafsson, President & CEO, Global Generics; Robert Stewart, COO; Michael Baker, Executive VP, Trade Sales & Development;

b.     **Mylan:** Joe Duda, President; Robert Potter, SVP N.A. National Accounts and Channel Development; Tony Mauro, COO;

c.     **Sun:** GP Singh Sachdeva, President of Sun Pharmaceuticals, USA.

134.     ██████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

█████████

a.     ████████████████████████████████████████

████████████████████████████████████████

███████████████████████████

---

[44] The NACDS holds an annual meeting every year, including between April 21-24, 2012. Plaintiffs do not yet have discovery from the NACDS for dates earlier than January 2013, but based upon their regular attendance later in the conspiracy period, the 2012 event is believed to have been attended by, at least, Defendants Actavis, Mylan, and Sun.

[45] ████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████████████

b.


135.    On June 4-5, 2013, GPhA held a meeting in Bethesda, Maryland that was attended by representatives from Defendants Actavis, Heritage, Mylan, and Sun.

136.    On August 10-13, 2013, NACDS held its 2013 Total Store Expo at the Sands Expo Convention Center in Las Vegas, Nevada. NACDS's August 2013 Total Store Expo was attended by the following representatives from Defendants, who were key executives for generic drug sales and pricing:

a.    **Actavis:** Michael Baker, Executive VP, Trade Sales & Development; Andrew Boyer, President & CEO N.A. Generics; Napolean Clark, Vice President, Marketing; Michael Dorsey, Director, National Accounts; Marc Falkin, Senior Vice President, Sales; Anthony Giannone, Executive Director Sales; Megan Gorman, Senior Marketing Manager; Richard Rogerson, Senior Director New Products, Business Analytics & Systems; Cindy Stevens, Director, National Accounts;

b.    **Heritage:** Matthew Edelson, Senior Director of Sales; Jeffrey A. Glazer (then CEO and Chairman); Jason T. Malek, SVP (then Senior Vice President, Commercial Operations, and subsequently President); Gina Gramuglia, Commercial Operations; Neal O'Mara, Senior Director, National Accounts; Anne Sather, Senior Director, National Accounts;

c.    **Mylan:** Mike Aigner, Director National Accounts; Kevin McElfresh, Executive Director National Accounts; Joe Duda, President; Robert Potter, Senior Vice President North America National Accounts and Channel Development; Rob O'Neill, Head of Sales; Lance Wyatt, Director National Accounts;

d.    **Sun:** GP Singh, President; William Everett, National Trade Account Manager; Wayne Fallis, Director National Accounts; Steven Goodman; Director Marketing Generics; Susan Knoblauch, Senior Manager, Sales; Grace Shen, Vice President, Marketing; and Steven Smith; Senior Director of Sales; and

e.    **West-Ward:** Tareq Darwazeh, National Account Senior Manager; Spiro Gavaris, Vice President, Sales & Marketing; Sam Goodman, Marketing Manager; Paul Markowitz, Director National Accounts.

137.    On October 28-30, 2013, GPhA held a meeting in Bethesda, Maryland that was attended by representatives from Defendants Actavis, Heritage, Sun, and Mylan.

138.    On February 19-21, 2014, GPhA held its Annual Meeting in Orlando, Florida that was attended by representatives Defendants Actavis, Heritage, Sun, and Mylan.

139.    On April 26-29, 2014, NACDS held its 2014 annual meeting in Scottsdale, Arizona. NACDS's 2014 annual meeting was attended by the following representatives from Defendants, who were key executives for generic drug sales and pricing:

a.    **Actavis:** Andrew Boyer, President and CEO NA Generics; Marc Falkin, Senior Vice President, Sales; Sigurdur Olafasson, President & CEO Global Generics Medicines; Paul Reed, Senior Director, Trade Sales & Development; Robert Steward, Chief Operating Officer;

b.    **Heritage:** Jeffrey Glazer (then CEO and Chair);

c.    **Mylan:** Joe Duda, President; Tony Mauro, President; Robert Potter, Senior Vice President North America National Accounts and Channel Development; Rob O'Neill, Head of Sales; and

d.    **Sun:** Singh Sachdeva, President; Steven Goodman; Director Marketing Generics; and Steven Smith; Senior Director of Sales.

140.    On May 12-15, 2014, MMCAP held its National Member Conference in Bloomington, Minnesota.  At MMCAP's 2014 National Member Conference, topics included "RFPs under consideration for Pharmacy," "contract evaluation," and "pharmaceutical price increases."  At the MMCAP conference, a Heritage employee met in person and discussed price increase strategies with a number of different competitors and was able to personally confirm agreement to fix prices of at least one drug (Glyburide).

141.    MMCAP's May 12-15, 2014 National Member Conference was attended by the following representatives from Defendants, who were key executives for generic drug sales and pricing:

    a.    **Actavis:** Mark Blitman, Executive Director of Sales for Government Markets;

    b.    **Mylan:** Jan Bell, Director, National Accounts;

    c.    **West-Ward:** Elizabeth Guerrero, Director, National Accounts; Joseph Schrick, Director, National Accounts; and

    d.    **Heritage:** Anne Sather, Director, National Accounts.

142.    ████████████████████████████████████████

███████████████████████████████████████████

█████████████████████████████

    a.    ███████████████████████████████

████████████████████████████████

█████████

█    ████████████████████████████████

████████████████████████████████

████████████████████████████████

███████████████████████████████

███████████████████



c.

143.    On June 3-4, 2014, GPhA held a meeting in Bethesda, Maryland that was attended by representatives from Defendants Actavis, Heritage, Sun, and Mylan.

144.    On August 23-26, 2014, NACDS held its 2014 Total Store Expo at the Boston Convention Center in Boston, Massachusetts. NACDS's August 2014 Total Store Expo was attended by the following representatives from Defendants, who were key executives for generic drug sales and pricing:

   a.    **Actavis:** Andrew Boyer, President & CEO North American Generics; David Buchen, Executive Vice President Commercial, North America Generics & International; Napoleon Clark, Vice President, Marketing; Ashley Delponte, Manager, Trade Marketing, Sales & Marketing; Michael Dorsey, Director National Accounts; Marc Falkin, Senior Vice President, Sales; Anthony Giannone, Executive Director, Sales; Megan Gorman, Manager, Marketing Senior; rob Hooper, Senior Marketing Manager; Randy Hurst, Senior Vice President & General Manager; Christina Koleto, Manager, Pricing Senior; Maureen Meehan; Director National Accounts; Paul Reed, Senior Director, Trade Sales & Development; Richard Rogerson, Senior Director New Products, Business Analytics & Systems; Violet Saakyan, Marketing Manager; Eric Schultz, Senior Marketing Manager; Cindy Stevens, Director, National Accounts;

   b.    **Heritage:** Heather Beem, National Accounts Manager, Institutional; Katie Brodowski, Associate Director Institutional Sales; Matthew Edelson, Senior Director of Sales; Jeffrey A. Glazer (then CEO and Chairman), Jason T. Malek, SVP (then Senior Vice President, Commercial Operations, and subsequently President); Gina Gramuglia, Commercial Operations; Neal O'Mara, Senior Director, National Accounts; Anne Sather, Senior Director National Accounts;

c.    **Mayne:** Stefan Cross: President; Gloria Schmid, Director of National Accounts; Chris Schneider, Executive Vice President, Generic Product Division;

d.    **Mylan:** Joe Duda, President; Robert Potter, Senior Vice President North America National Accounts; Mike Aigner, Director, National Accounts; Tony Mauro, President; Kevin McElfresh, Executive Director, National Accounts; Gary Tighe, Director, National Accounts; Lance Wyatt, Director, National Accounts;

e.    **Sun:** GP Singh Sachdeva, President; Wayne Fallis, Director, National Accounts; Steven Goodman, Director, Marketing Generics; Donna Hughes, National Account Manager; Susan Knoblauch; Senior Manager, Sales; Jolene McGalliard, National Account Manager; Anand Shah, Director, Strategic Pricing and Marketing; Grace Shen, Vice President, Marketing; Steven Smith, Senior Director of Sales; and

f.    **West-Ward:** Spiro Gavaris, Vice President, Sales and Marketing; Sami Goodman, Marketing Manager; Elizabeth Guerrero, Director, National Accounts; Paul Markowitz, Director, National Accounts; Joel Rosenstack, Senior Director, Marketing; Doug Statler, Senior Director, Head of Sales.

145.    On October 27-29, 2014, GPhA held a meeting in Bethesda, Maryland that was attended by representatives from Defendants Actavis, Heritage, West-Ward, and Mylan.

146.    In  2015, and 2016, Defendants continued to regularly attend trade association meetings, conferences and events.

147.    As uncovered in the State AGs' ongoing investigation, at these various conferences and trade shows, representatives from Defendants, as well as other generic drug manufacturers, discussed their respective businesses and customers.  These discussions would occur at social events, including lunches, cocktail parties, dinners, and golf outings, that usually accompanied these conferences and trade shows.  Defendants' employees used these opportunities to discuss

and share upcoming bids, specific generic drug markets, pricing strategies and pricing terms in their contracts with customers.[46]

148.    In conjunction with meetings at conferences and trade shows, representatives of generic drug manufacturers get together separately, in more limited groups, allowing them to further meet face-to-face with their competitors and discuss their business.  In fact, high-level executives of many generic drug manufacturers get together periodically for what at least some of them refer to as "industry dinners."[47]

149.    A large number of generic drug manufacturers, including Defendants Actavis, Mylan, Sun, West-Ward, and Heritage, are headquartered or have major offices in close proximity to one another in New Jersey and eastern Pennsylvania, giving them easier and more frequent opportunities to meet and collude.  For example, in January 2014, at least thirteen high-ranking male executives, including CEOs, Presidents, and Senior Vice Presidents of various generic drug manufacturers, met at a steakhouse in Bridgewater, New Jersey.

150.    Generic drug manufacturer employees also get together regularly for what is referred to as a "Girls' Night Out" ("GNO"), or alternatively "Women in the Industry" meetings and dinners.  During these GNOs, meetings and dinners, these employees meet with their competitors and discuss competitively sensitive information.  For example, several different GNOs were held in 2015, including: (1) in Baltimore, Maryland in May, and (2) at the NACDS conference in August.

---

[46] *See, e.g.*, Amended Complaint (Public Version) ¶¶50-52, *Connecticut v. Aurobindo Pharma USA, Inc.*, No. 16-cv-2056, ECF 168 (D. Conn.), *available at* http://www.ct.gov/ag/lib/ag/press_releases/2016/20161215_gdms_complain.pdf.

[47] *Id.* at ¶¶53-60.

151.     Through these various interactions, Defendants' employees are often acutely aware of their competition and, more importantly, each other's current and future business plans.  This familiarity and opportunity often leads to agreements among competitors to fix prices or to allocate a given market so as to avoid competing with one another on price.

152.     Defendants also routinely communicate and share information with each other about bids and pricing strategy.  This can include forwarding bid packages received from a customer (*e.g.*, a Request for Proposal or "RFP") to a competitor, either on their own initiative, at the request of a competitor, or by contacting a competitor to request that the competitor share that type of information.

153.      Additionally, Defendants share information regarding the terms of their contracts with customers, including various terms relating to pricing, price protection, and rebates.  Defendants use this information from their competitors to negotiate potentially better prices or terms with their customers, which could be to the ultimate detriment of consumers.

   **1.     Investor communications demonstrate Defendants' intent to fix and maintain supracompetitive prices.**

154.     Defendants' public statements and admissions in their investor communications show that Defendants realized record revenues during the Class Period and emphasize a commitment to increasing generic pharmaceutical prices as well as maintaining them at supracompetitive levels.

155.     **Actavis**:   During Actavis' October 29, 2013 earnings call, Actavis Director Sigurdur Olafsson stated: "But there's opportunities to take pricing increases, and that is what has changed since maybe five years ago when there wasn't an opportunity."

156.     During Actavis' August 5, 2014 earnings call, Actavis EVP David Buchen stated: "We have a very broad portfolio and we take pricing opportunities where we can."

157.   During Actavis' May 11, 2015 earnings call, Actavis CEO Brenton Saunders stated:

> So let me tackle generic pricing. . . . We haven't seen much of a change despite all the fanfare and publicity around drug pricing in generics. There are obviously a few products that go up. But the model for generics is price decreases as more competitors come into the market. That's just the way the business works. . . . That being said, the environment has remained pretty stable and favorable. So we don't expect that to change short term either.

158.   On August 6, 2015, Saunders stated on an earnings call that the generics business "is doing very well, and the units that comprise it are firing on all cylinders as we prepare for the combination with Teva."

159.   Actavis reported rising revenues in its United States generics business during the Class Period.

160.   **Mayne:** In an August 28, 2015 FY15 Results Presentation, Mayne reported that U.S. "revenue uplift [was] driven by," among other products, Doxycycline.

161.   In a September 9, 2015 Company Presentation, Mayne reported that it would be able to optimize Doxycycline sales through "[f]urther product pricing improvements."

162.   **Mylan:** On February 27, 2013, Mylan's CFO, John Sheehan, stated in an earnings call:

> 2013 will yet be another strong year for Mylan. In the U.S., we are anticipating a high volume of new product launches, and we expect to once again be agile enough to quickly seize new supply opportunities when they become available. In addition, favorable changes to the regulatory environment, including increased resources to expedite product reviews and greater oversight with respect to manufacturing, as well as an anticipated more stable pricing environment resulting in part from continued consolidation within the industry, are just two of the favorable macroeconomic factors that we see in 2013.

163.   On May 2, 2013, Bresch stated in an earnings call: "From my perspective, we see the generic industry alive and well. We still see a lot of runway room here in the United States."

164.    On May 1, 2014, Bresch stated in an earnings call: "We continue to see stability really across our entire generic line on pricing."

165.    On August 7, 2014, Bresch stated in an earnings call:

As far as pricing, look, I think that, that stability in our North American – that core business is certainly why we're able to deliver the results we have today, which, like I said, despite those product delays, we see growth year-over-year.  We've seen North America continue to maximize opportunities.

166.    On October 30, 2015, Sheehan stated in an earnings call:

With respect to gross margin, I guess I would start by pointing out that since 2010 our gross margins have increased from 45% up to the high end of the guidance range that we indicated we would be at this year of 55%.  So the gross margins have been sustained.  They have steadily increased over the last five, six years.  . . . It also has been driven by the positive pricing environment that we've seen, especially over the last couple of years in North America.

167.    On February 10, 2016, Bresch stated in an earnings call her belief that Mylan had been "a very responsible generic player with hundreds of products into the market and have shown very responsibly price erosion."

168.    Mylan reported rising revenues in its United States generics business during the Class Period.

169.    **Sun:** On May 28, 2013, Sun's Managing Director Dilip Shanghvi sated in response to an analyst question concerning generic drug manufacturers' "opportunities [to take] price hikes across portfolio that seems to becoming a little more widespread sort of a thing." On the same call, another Sun executive Sudhir Valia stated that "we have been all the time warning about sustaining the price, but we have been proved wrong so far."

170.    In 2013, Sun's subsidiary URL "had undertaken price hikes in March" and, as a result of these price increases, Sun estimated "$60-80 million (of $128 million in total revenue for

URL estimated ... for FY[20]14) to come from [Doxycycline] , with operating margins in the range of 50-55 percent."[48]

171.    In 2013 and 2014, Sun reported that its costs were stable.  In its quarterly reports during that period, Sun's directors reported that the company's material cost and other expenditures as a percentage of net sales, as well as staff costs, were substantially the same or lower than the same periods in the prior year.  For example, Sun reported that net sales increased 40% in fiscal year 2013 compared to 2012 even while "[m]aterial cost, as a percentage of the net sales is 18.5% which is lower as compared to the previous year."  Staff costs and other expenditures were also reported to be lower in 2013.  Similarly, Sun reported that second quarter 2013-14 costs were also "in-line with Q2 last year."

172.    On February 13, 2014, Sanghvi stated in an earnings call that: "We continued to enjoy the benefits of favourable pricing for certain generic products in the US."  On the same call, an analyst also noted that Sun "had some good price increases in select products after [Sun's] purchase of [the URL] portfolio."

173.    Sun reported in September 2015 and February 2016 investor presentations that one of the "key drivers" of its sales through the period 2012 through 2014 was Doxycycline, which it described as a "low competition product" in the U.S. - a notable description in light of the large number of competitor products.

174.    Sun reported rising revenues in its United States generics business during the Class Period.

---

[48] Ujjval Jauhari, *Sun Pharma's Prospects Remain Bright*, Business Standard (Sept. 12, 2013), *available at* http://www.business-standard.com/article/markets/sun-pharma-s-prospects-remain-bright-113091200894_1.html.

175.    **West-Ward:** In 2013, Hikma, parent company to West-Ward, reported that "[s]trong cash flow reflects exceptional profitability of Doxycycline."[49]

176.    On March 12, 2014, Hikma announced strong revenue growth, driven in part by Doxycycline sales, and forecasted continued growth in 2014, which would reflect continued commitment to maintaining its Doxycycline pricing.   Said Darwazah, Hikma's CEO was "confident about the prospects for 2014," and noted that in 2013, "[o]ur Generics business delivered very strong revenue, driven primarily by Doxycycline, and generated significant cash flow."[50]

177.    In Hikma's Q2 2014 earnings call, Hikma's CFO stated: "I don't know how many of you have covered U.S. generic companies. But when I look at competitors, I look at the -- most companies that are either U.S. based or have a strong position in the U.S. are doing very well the last few years.  So the market forces are changing, I believe, in the market."

178.    In December 2013, Darwazah told Bloomberg Business that West-Ward's huge increases in Doxycycline prices were justified because it was "'forced' to raise prices because its competitors raised theirs."[51]

179.    West-Ward reported rising revenues in its United States generics business during the Class Period.

---

[49] 2013 Hikma Pharmaceuticals Preliminary Results.

[50] Press Release, Hikma Pharmaceuticals plc (Mar. 12, 2014).

[51] Alan Katz, *Surprise! Generic Drug Prices Spike*, Bloomberg (Dec. 12, 2013), available at https://www.bloomberg.com/news/articles/2013-12-12/generic-drug-prices-spike-in-pharmaceutical-market-surprise.

## 2. Industry commentary indicates Defendants' collusion is a plausible explanation for the increase in Doxycycline price

180.   Comments from industry analysts suggest manufacturers' alternative explanations for the price hikes (*e.g.*, supply disruptions) are mere pretext, intended to shroud the Defendants' conspiratorial conduct and ends.  For instance, Richard Evans at Sector & Sovereign Research wrote:

> A plausible explanation [for price increases] is that generic manufacturers, having fallen to near historic low levels of financial performance are cooperating to raise the prices of products whose characteristics – low sales due to either very low prices or very low volumes – accommodate price inflation.[52]

181.   According to one study, since 2013 approximately one in 19 generic drugs sold in the United States have undergone major price hikes that may be consistent with collusion:

> Fideres Partners LLP, a London-based consultancy that works with law firms to bring litigation against companies, reported "anomalous pricing patterns" in scores of generic drugs sold in the U.S. from 2013 to 2016.  It identified 90 medicines whose prices rose at least 250 percent over the three-year period and were increased by at least two drug companies around the same time, even though there was no obvious market reason for the increases.  The average price jump among the 90 drugs was 1,350 percent, Fideres found.

> "I don't think the public or even the politicians in the U.S. have any idea just how widespread and extreme the phenomenon is," said Alberto Thomas, one of Fideres's founders.[53]

182.   Another study concluded that in 2014: "292 generic medication listings went up by 10% or more, 109 at least doubled in price and 14 went up by ten or more times in price that

---

[52] *See* Ed Silverman, *Generic Drug Prices Keep Rising, but is a Slowdown Coming?*, WALL STREET JOURNAL (Apr. 22, 2015), *available at* http://blogs.wsj.com/pharmalot/2015/04/22/generic-drug-prices-keep-rising-but-is-a-slowdown-coming/.

[53] Liam Vaughan and Jered S. Hopkins, *Mylan, Teva Led Peers in "Anomalous" Price Moves, Study Says*, BLOOMBERG (Dec. 22, 2016) *available at* https://www.bloomberg.com/news/articles/2016-12-22/widespread-drug-price-increases-point-to-collusion-study-finds.

year."[54]  The GAO Report also noted similar "extraordinary price increases" across many generic drugs, including Doxycycline, in recent years that could not be linked to any particular cause.

183.    Pennsylvania physicians through the Pennsylvania Medical Society called on state and federal governments to investigate surging generic prices, believing anticompetitive conduct was to blame:

> According to Robert Campbell MD, chair of Physicians Against Drug Shortages and immediate past president of the Pennsylvania Society of Anesthesiologists, surging prices have hit hundreds of mainstay generics, including anesthetics, chemotherapeutic agents, antibiotics, and nutritional intravenous solutions. He believes the surging prices are a result of anti-competitive behavior.[55]

**E.    Defendants' conduct in generic drug pricing is under investigation by the United States Congress, the DOJ, and the State Attorneys General.**

**1.    In response to news reports of the dramatic rise in price of certain generic drugs, Congress launched an investigation into the dramatic rise in price of certain generic drugs.**

184.    As noted above, in January 2014 the NCPA sent correspondence to the United States Senate HELP Committee and the United States House Energy and Commerce Committee requesting hearings on significant spikes in generic pharmaceutical pricing.

185.    On October 2, 2014, Senator Bernie Sanders (I-VT), Chair of the Subcommittee on Primary Health and Aging, Senate Committee on Health, Education, Labor and Pensions, and Representative Elijah E. Cummings (D-MD), the Ranking Member of the House Committee on Oversight and Government Reform, sent letters to 14 drug manufacturers, including Defendants Actavis, Heritage, Mylan, Sun, and West-Ward, requesting information about the escalating prices

---

[54] David Belk, MD, *Generic Medication Prices, available at* http://truecostofhealthcare.net/generic_medication_prices/.

[55] Pennsylvania Medical Society, Press Release, *Rising Generic Drug Costs Have Physicians Raising Red Flags* (Feb. 5, 2016), *available at* http://www.prnewswire.com/news-releases/rising-generic-drug-costs-have-physicians-raising-red-flags-300216006.html.

of generic drugs used to treat everything from common medical conditions to life-threatening illnesses.[56]

186.     Senator Sanders and Representative Cummings issued a joint press release, advising "[w]e are conducting an investigation into the recent staggering price increases for generic drugs used to treat everything from common medical conditions to life-threatening illnesses."  They noted the "huge upswings in generic drug prices that are hurting patients" are having a "'very significant'" impact threatening pharmacists' ability to remain in business.[57]

187.     The October Letter to Mylan, for example, states,

> We are writing to your company to request information about the escalating prices it has been charging for five drugs: Albuterol Sulfate, Belnazepril/Hydrochlorothiazide, Divalproex Sodium ER, Doxycycline Hyclate, and Pravastatin Sodium . . . According to data provided by the Healthcare Supply Chain Association (HSCA), the average price charged for these drugs have increased as much as. . . 8,271 percent for Doxycycline Hyclate . . . from October 2013 to April 20014.  Over that time period, the average market price went up by as much as . . . $1,829 for Doxycycline Hyclate.[58]

188.     In Mylan's October Letter, Senator Sanders and Representative Cummings requested the following information and documents from January 1, 2012, to the present:

(1)     Total gross revenues from the company's sales of these drugs;

(2)     The dates, quantities, purchasers, and prices paid for all sales of these drugs;

---

[56] U.S. Senator Bernie Sanders Website, Press Release, *Congress Investigating Why Generic Drug Prices Are Skyrocketing* (Oct. 2, 2014), *available at* https://www.sanders.senate.gov/newsroom/press-releases/congress-investigating-why-generic-drug-prices-are-skyrocketing.

[57] *Id.*

[58] *See* Letter from Bernie Sanders, United States Senator, and Elijah Cummings, United States Representative, to Heather Bresch, CEO of Mylan, *available at* https://www.sanders.senate.gov/newsroom/press-releases/congress-investigating-why-generic-drug-prices-are-skyrocketing.

(3)   Total expenses relating to the sales of these drugs, as well as the specific amounts for manufacturing, marketing and advertising, and purchases of active pharmaceutical ingredients, if applicable;

(4)   Sales contracts or purchase agreements for active pharmaceutical ingredients for these drugs, including any agreements relating to exclusivity, if applicable;

(5)   A description and valuation of the specific financial and non-financial factors that contributed to your company's decisions to increase the prices of these drugs;

(6)   Any cost estimates, profit projections, or other analyses relating to the company's current and future sales of these drugs;

(7)   Prices of these drugs in all foreign countries or markets, including price information for the countries paying the highest and lowest prices; and

(8)   The identity of company official(s) responsible for setting the prices of these drugs over the above time period.

189.   Mylan's letter provided that the requested information and documents be turned in to congressional offices by October 23, 2014.  Defendants Actavis, Heritage, Sun, and West-Ward were requested to provide substantially similar information with regard to Doxycycline.

190.   On February 24, 2015, Senator Sanders and Representative Cummings sent a letter requesting that the Office of the Inspector General ("OIG") of the Department of Health and Human Services "examine recent increases in the prices being charged for generic drugs and the effect these price increases have had on generic drug spending within the Medicare and Medicaid programs."[59]  The OIG responded to the request on April 13, 2015, advising it would examine

---

[59] Letter from Sen. Bernard Sanders & Rep. Elijah E. Cummings, U.S. Cong., to Inspector Gen. Daniel R. Levinson, Dep't of Health & Human Servs. (Feb. 24, 2015), *available at* http://www.sanders.senate.gov/download/sanders-cummings-letter?inline=file.

pricing for the top 200 generic drugs to "determine the extent to which the quarterly [Average Manufacturer Pricing] exceeded the specified inflation factor."[60]

191.    In August 2016, the United States GAO issued its report finding "extraordinary price increases" on many generic pharmaceuticals including Doxycycline.[61]

### 2.    The DOJ launched a broad criminal investigation into anticompetitive conduct by generic drug manufacturers.

192.    The DOJ opened a criminal investigation into collusion in the generic pharmaceutical industry on or about November 3, 2014.  The DOJ also empaneled a grand jury in this District at about the same time.

193.    Initial reports suggest that, at the beginning, the DOJ's probe was focused on two generic drugs: digoxin and Doxycycline.  However, news reports, court filings, and other public statements have confirmed the sweeping nature of the DOJ's investigation.  Reportedly, the DOJ believes price-fixing between makers of generic pharmaceuticals is widespread, and its investigation could become the next auto parts investigation, which is the DOJ's largest prosecution to date.[62]  According to sources cited by Bloomberg, the DOJ investigation already "spans more than a dozen companies and about two dozen drugs." [63]  As noted elsewhere herein,

---

[60] Letter from Inspector Gen. Daniel R. Levinson, Dep't of Health & Human Servs., to Sen. Bernard Sanders (Apr. 13, 2015), *available at* http://www.sanders.senate.gov/download/oig-letter-to-sen-sanders-4-13-2015?inline=file.

[61] GAO Report to Congressional Requesters, *Generic Drugs Under Medicare* (Aug. 2016), *available at* http://www.gao.gov/assets/680/ 679055.pdf.

[62] Joshua Sisco, *DoJ believes collusion over generic drug prices widespread—source*, POLICY AND REGULATORY REPORT (June 26, 2015), *available at* http://www.mergermarket.com/pdf/DoJ-Collusion-Generic-Drug-Prices-2015.pdf.

[63] David McLaughlin and Caroline Chen, *U.S. Charges in Generic Drug Probe to be Filed by Year-End*, BLOOMBERG (Nov. 3, 2016), *available at* https://www.bloomberg.com/news/articles/2016-11-03/u-s-charges-in-generic-drug-probe-said-to-be-filed-by-year-end.

the DOJ's investigation has yielded criminal guilty pleas from Glazer and Malek of Heritage concerning "Doxycycline Hyclate."

194.   **Actavis:** Actavis' parent Allergan plc disclosed in public filings that it received a subpoena from the DOJ, on June 25, 2015, "seeking information relating to the marketing and pricing of certain of the Company's generic products and communications with competitors about such products."[64]

195.   **Mayne**: In its 2016 Annual Report, Mayne Pharma Ltd. disclosed that it was "one of numerous generic pharmaceutical companies to receive a subpoena from the Antitrust Division of the US Department of Justice [] in the last two years seeking information relating to marketing, pricing and sales of select generic drugs" and that it had also received a subpoena from the CTAG seeking similar information.[65]

196.   **Mylan**: Mylan disclosed in a 2016 filing with the United States Securities and Exchange Commission (SEC) that it received a DOJ subpoena "seeking information relating to the marketing, pricing, and sale of our generic Doxycycline products and any communications with competitors about such products." [66]  Mylan received a similar subpoena from the CTAG, seeking "information relating to the marketing, pricing and sale of certain of the Company's generic products (including Doxycycline) and communications with competitors about such products."[67]

---

[64] Allergan, SEC 2015 Form 10-K (Feb. 26, 2016), at 27, *available at* https://www.sec.gov/Archives/edgar/data/1578845/000156459016013478/agn-10k_20151231.htm.

[65] Mayne, 2016 Annual Report (Aug. 25, 2016), at 75, *available at* https://www.maynepharma.com/media/1788/2016-mayne-pharma-annual-report.pdf.

[66] Mylan, SEC 2015 Form 10-K (Feb. 16, 2016), at 160, *available at* https://www.sec.gov/Archives/edgar/data/1623613/000162361316000046/myl10k_20151231xdoc.htm.

[67] *Id.*

197.    Subsequently, on November 9, 2016, Mylan disclosed in its quarterly report that both it and "certain employees and senior management, received subpoenas from the DOJ seeking additional information relating to the marketing, pricing and sale of our generic Cidofovir, Glipizide-metformin, Propranolol and Verapamil products and any communications with competitors about such products."[68]  Significantly, Mylan disclosed that "[r]elated search warrants also were executed" in connection with DOJ's investigation.[69]

198.    **Sun**: Sun also received a grand jury subpoena as part of the DOJ's generics probe.[70] Reportedly, the DOJ asked Sun for documents related to employee and corporate records and communications with competitors.[71]

199.    Defendants are not alone.  Numerous other generic manufacturers have likewise received subpoenas in connection with the DOJ and the State AG's broad investigations into anticompetitive conduct in the generic drug industry.  Additionally, some of these generic manufacturers have disclosed that search warrants have been executed or that certain employees have been separately subpoenaed as part of these ongoing probes.

200.    The fact that these companies received subpoenas from a federal grand jury is significant, as is reflected in Chapter 3 of the 2014 edition of the DOJ's Antitrust Division Manual.

---

[68] Mylan SEC Form 10-Q (Nov. 9, 2016), at 58, *available at* https://www.sec.gov/Archives/edgar/data/1623613/000162361316000071/myl10q_20160930xdoc.htm.

[69] *Id.*

[70] David McLaughlin and Caroline Chen, *U.S. Charges in Generic Drug Probe to be Filed by Year-End*, BLOOMBERG (Nov. 3, 2016), *available at* https://www.bloomberg.com/news/articles/2016-11-03/u-s-charges-in-generic-drug-probe-said-to-be-filed-by-year-end.

[71] Zeba Siddiqui, *India's Sun Pharma Gets U.S. Subpoena Over Generic Drugs Pricing*, REUTERS (May 28, 2016), *available at* http://www.reuters.com/article/sun-pharm-usa-idUSL4N18P00X.

Section F.1 of that chapter notes that "staff should consider carefully the likelihood that, if a grand jury investigation developed evidence confirming the alleged anticompetitive conduct, the Division would proceed with a criminal prosecution."[72]  The staff request needs to be approved by the relevant field chief and is then sent to the Antitrust Criminal Enforcement Division.[73]  "The DAAG [Deputy Assistant Attorney General] for Operations, the Criminal DAAG, and the Director of Criminal Enforcement will make a recommendation to the Assistant Attorney General.  If approved by the Assistant Attorney General, letters of authority are issued for all attorneys who will participate in the grand jury investigation."[74]  "The investigation should be conducted by a grand jury in a judicial district where venue lies for the offense, such as a district from or to which price-fixed sales were made or where conspiratorial communications occurred."[75]

201.    Receipt of federal grand jury subpoenas is an indication that antitrust offenses have occurred.

202.    That a target has reportedly applied for leniency is also significant.[76]  As the DOJ notes on its web site (http://www.justice.gov/atr/frequently-asked-questions-regarding-antitrust-divisions-leniency-program):

> **5. Does a leniency applicant have to admit to a criminal violation of the antitrust laws before receiving a conditional leniency letter?**

---

[72] DOJ, Antitrust Division Manual (5th ed. 2015) at III-82.

[73] *Id.*

[74] *Id.* at III-83.

[75] *Id.*

[76] Leah Nylen and Josh Sisco, *Generic drug investigation started small before ballooning to dozen companies*, mlex (Nov. 4, 2016) ("While the Justice Department didn't have a whistleblower at the beginning of the investigation, it is understood that [in the summer of 2016] a company applied for leniency, which grants full immunity to the first company to come forward and admit to cartel violations."), *available at* http://www.mlex.com/GlobalAntitrust/DetailView.aspx?cid=841053&siteid=191&rdir=1.

> Yes. The Division's leniency policies were established for corporations and individuals "reporting their illegal antitrust activity," and the policies protect leniency recipients from criminal conviction. Thus, the applicant must admit its participation in a criminal antitrust violation involving price-fixing, bid rigging, capacity restriction, or allocation of markets, customers, or sales or production volumes before it will receive a conditional leniency letter. Applicants that have not engaged in criminal violations of the antitrust laws have no need to receive leniency protection from a criminal violation and will receive no benefit from the leniency program.

The DOJ further provides that the leniency applicant must also satisfy the following condition, among others, to avail itself of the government's leniency: "[t]he confession of wrongdoing is truly a corporate act, as opposed to isolated confessions of individual executives or officials." *Id*.

203.    The DOJ's first charges were made on December 12, 2016, against Glazer and Malek with criminal counts related to collusion for Doxycycline Hyclate and glyburide.  *See United States of America v. Jeffrey A. Glazer*, No. 2:16-cr-00506-RBS (E.D. Pa.); *United States of America v. Jason T. Malek*, No. 2:16-cr-00508-RBS (E.D. Pa.).  On January 9, 2017, both Glazer and Malek pleaded guilty to the charges.  At their plea hearings, Glazer and Malek admitted, among other things, that their co-conspirators included "individuals that [Glazer] supervised at his company and those he reported to at his company's parent[.]"  Sentencing for both Glazer and Malek was originally set for April 2017 but was later rescheduled to September 2017 as they continue to cooperate with the DOJ.

204.    The DOJ has intervened in MDL 2724 as well as numerous civil antitrust actions alleging price-fixing, bid rigging, and market and customer allocation of generic pharmaceuticals stating that these cases overlap with the DOJ's ongoing criminal investigation.  For example, in a civil antitrust action related to the generic pharmaceutical propranolol, the DOJ intervened and requested a stay, stating that "the reason for the request for the stay is the government's ongoing criminal investigation and overlap of that investigation and this case," and that "the government's

ongoing investigation is much broader than the [Glazer and Malek] informations that were unsealed."[77]   The DOJ filed a brief with the United States Judicial Panel on Multidistrict Litigation noting that, "The complaints in those civil cases – which typically allege that a group of generic pharmaceutical companies violated Section 1 of the Sherman Act by conspiring to fix prices and allocate customers for a particular drug – overlap significantly with aspects of the ongoing criminal investigation."[78]   As noted above, the DOJ also filed a motion for a stay of discovery in MDL 2724 stating that: "Evidence uncovered during the criminal investigation implicates other companies and individuals (including a significant number of the Defendants here) in collusion with respect to Doxycycline Hyclate, glyburide, and other drugs (including a significant number of the drugs at issue here)."[79]

205.   The DOJ's Spring 2017 Division Update notes that:

> Millions of Americans purchase generic prescription drugs every year and rely on generic pharmaceuticals as a more affordable alternative to brand name medicines.   The Division's investigation into the generics market, however, has revealed that some executives have sought to collude on prices and enrich themselves at the expense of American consumers.[80]

**3.   Led by the State of Connecticut, 45 state attorneys general launched their own investigation of antitrust violations in the generic drug industry.**

206.   The State AG action was filed just days after the DOJ filed its first criminal charges against two former executives of Heritage Pharmaceuticals.   According to the State AG complaint,

---

[77] *See* Tr. of Hearing, *In re Propranolol Antitrust Litig.*, No. 16-cv-9901, ECF 112 (S.D.N.Y. Feb. 21, 2017).

[78] *See* Memorandum of Amicus Curiae United States of America Concerning Consolidation, *In re Generic Digoxin and Doxycycline Antitrust Litig.*, MDL No. 2724, ECF 284 (J.P.M.L. Mar. 10, 2017).

[79] *See* Intervenor United States' Motion to Stay Discovery, *In re Generic Pharmaceuticals Pricing Antitrust Litigation*, MDL No. 2724, ECF 279 (E.D. Pa. May 1, 2017).

[80] DOJ Website, Division Update Spring 2017 (Mar. 28, 2017), *available at* https://www.justice.gov/atr/division-operations/division-update-spring-2017/division-secures-individual-and-corporate-guilty-pleas-collusion-industries-where-products.

the information developed through its investigation (which is still ongoing) uncovered evidence of a broad, well-coordinated, and long-running series of schemes to fix the prices and allocate markets for a number of generic pharmaceuticals in the United States.   Although the State AG action currently focuses on Doxycycline Hyclate DR and glyburide, it alleges that the Plaintiff States have uncovered a wide-ranging series of conspiracies implicating numerous different generic pharmaceuticals and competitors.  As reported by *The Connecticut Mirror*, the CTAG "suspected fraud on a broader, nearly unimaginable scale" and "new subpoenas are going out, and the investigation is growing beyond the companies named in the suit."[81]  CTAG George Jepsen has called evidence that has so far been obtained in the State AG investigation "mind-boggling."[82]

207.    CTAG George Jepsen confirmed the scope of the State AG action in the following press release:

> My office has dedicated significant resources to this investigation for more than two years and has developed compelling evidence of collusion and anticompetitive conduct across many companies that manufacture and market generic drugs in the United States. . . . While the principal architect of the conspiracies addressed in this lawsuit was Heritage Pharmaceuticals, we have evidence of widespread participation in illegal conspiracies across the generic drug industry. Ultimately, it was consumers – and, indeed, our healthcare system as a whole – who paid for these actions through artificially high prices for generic drugs. We intend to pursue this and other enforcement actions aggressively, and look forward to working with our colleagues across the country to restore competition and integrity to this important market.[83]

---

[81] Mark Pazniokas, *How a small-state AG's office plays in the big leagues*, The Connecticut Mirror (Jan. 27, 2017), *available at* https://ctmirror.org/2017/01/27/how-a-small-state-ags-office-plays-in-the-big-leagues/.  *The Connecticut Mirror* further reported that the DOJ grand jury was convened in this District shortly after the CTAG issued its first subpoena.  *Id.*

[82] *Id.*

[83] CTAG Website, Press Release, *Connecticut Leads 20 State Coalition Filing Federal Antitrust Lawsuit against Heritage Pharmaceuticals, other Generic Drug Companies* (Dec. 15, 2016), *available at* http://www.ct.gov/ag/cwp/view.asp?Q=588538&A=2341.

208.    In filings with the United States Judicial Panel on Multidistrict Litigation on May 16, 2017 and June 13, 2017, the State AGs reiterated that their ongoing investigation is broad in scope and goes beyond Doxycycline Hyclate DR and glyburide.[84]  The State AGs further stated that their Doxycycline Hyclate DR and glyburide action "encompass[es] illegal agreements – including with regard to Doxy DR – where prices remained constant (or remained higher than they would have been in a competitive market) as a result of customer or market allocation agreements designed specifically to avoid price erosion[.]"  The State AGs also disclosed that they have entered into settlements with Glazer and Malek and that these settlements require Glazer and Malek's cooperation with the State AGs.

209.    During a conference call on July 27, 2017, W. Joseph Nielsen, an assistant AG for the State of Connecticut, said "he expects future actions by the group of states investigating price-fixing and market allocation in the generic drug industry" including "more lawsuits against additional generic manufacturers for additional drugs [and] lawsuits against high-level executives for their roles in the collusion."[85]  Nielsen also stated that the States AGs realized very quickly that the generic drug industry is "set up structurally in a way that fosters and promotes collusion among generic competitors" and that the State AG investigation "has expanded greatly to the point where we are now looking at numerous drugs."

---

[84] *See* Brief and Reply in Support of Plaintiff States' Motion to Vacate Conditional Transfer Order (CTO-3), *In re Generic Pharmaceuticals Pricing Antitrust Litig.*, MDL No. 2724, ECF 321 & 334 (J.P.M.L. May 16, 2017 & June 13, 2017).

[85] Can Calik, *Future actions by state enforcers expected over generic drug collusion, Connecticut official says*, MLEX (July 27, 2017), *available at* http://www.mlex.com/GlobalAntitrust/DetailView.aspx?cid=908454&siteid=191&rdir=1.

210.    New York AG Eric T. Schneiderman also reported that the State AG Action "uncovered evidence of a broad, well-coordinated and long running series of conspiracies to fix prices and allocate markets for certain generic pharmaceuticals in the United States."[86]

211.    The DOJ and State AG investigations of alleged price-fixing and other unlawful conduct in the generic pharmaceutical industry are ongoing.

## VII.   THE DOXYCYCLINE MARKET IS HIGHLY SUSCEPTIBLE TO COLLUSION

212.    Because Defendants' anticompetitive conduct constitutes a conspiracy to fix prices and engage in market and customer allocation, which is a *per se* violation of Section 1 of the Sherman Antitrust Act, Plaintiffs need not define a relevant market.  However, there are features of the market relevant to this case that show both (i) that the market is susceptible to collusion and (ii) that the price increases were in fact the result of collusion and not the result of conscious parallelism.

213.    Factors showing that a market is susceptible to collusion include in this case:

(1)    **High Level of Industry Concentration** – A small number of competitors (Defendants) control a substantial market share for Doxycycline, as detailed above.

(2)    **Sufficient Numbers to Drive Competition** – While the market for Doxycycline had a small enough number of competitors to foster collusion, the number of makers was large enough that – given decades of experience with competitive generic pricing, and accepted models of how generic companies vigorously compete on price – one would have expected prices to remain at their historical, near direct cost levels or to decrease.  With the number of generic competitors such as there were here, historical fact and accepted economics teaches that – absent collusion – prices would remain at competitive levels or continue to decline.

(3)    **High Barriers to Entry** – The high costs of manufacture, intellectual property, development and testing requirements, and lengthy time delay,

---

[86] New York AG Website, Press Release, *A.G. Schneiderman Files Federal Antitrust Lawsuit With 19 Other States Against Heritage Pharmaceuticals And Other Generic Drug Companies* (Dec. 15, 2016), *available at* https://ag.ny.gov/press-release/ag-schneiderman-files-federal-antitrust-lawsuit-19-other-states-against-heritage.

related to regulatory approval and oversight are among the barriers to entry in the generic drug market. Specifically, any potential new entrants would have to go through the lengthy ANDA-approval process before coming to market, a process which takes many months, if not years. By insulating against new entrants, these barriers to entry and others increase the market's susceptibility to a coordinated effort among the dominant players to maintain supracompetitive prices.

(4)   **High Inelasticity of Demand and Lack of Substitutes** – For majority of patients that rely on it, Doxycycline is a necessity that must be purchased regardless of price hikes. While there are other antibiotics on the market, there are significant barriers to changing treatments, and patients and physicians are likely to prioritize medical considerations over price. This makes demand for Doxycycline highly inelastic.

(5)   **Absence of Material Non-Conspiring Competitors** – Defendants have maintained a substantial market share for Doxycycline throughout the Class Period despite their supracompetitive pricing. Thus, Defendants have market power in the market for Doxycycline, which enables them to increase prices or maintain artificially inflated prices without loss of market share or substantial revenue to non-conspirators.

(6)   

(7)   **Size of Price Increases** – The magnitude of the price increases involved in this case further differentiates them from parallel price increases. Companies seeking to test market increases need to take measured approaches. But here the increases are not [redacted] – the increases are of far greater magnitude. A rational company, when unaided with the certainty that its ostensible competitors would follow, would not do so.

(8)   **Reimbursement of Generic Drugs** – This market, as with many generic markets, has institutional features that would inhibit non-collusive parallel price increases. The reimbursement for generic pharmaceuticals to retail pharmacies is limited by MAC pricing, which is based on the lowest acquisition cost for each generic pharmaceutical paid by retail pharmacies purchasing from a wholesaler for each of a pharmaceutical's generic equivalent versions. As a result, there is an enhanced incentive to compete on price embedded in the generic reimbursement system.

214.     Through their market dominance, Defendants have been able to substantially foreclose the market to rival competition, thereby maintaining and enhancing market power and enabling Defendants to charge Plaintiffs and the proposed Class members inflated prices above competitive levels for Doxycycline through unlawful price collusion.

## VIII.   THE STATUTES OF LIMITATIONS DO NOT BAR PLAINTIFFS' CLAIMS

### A.     The statutes of limitations did not begin to run because Plaintiffs did not and could not discover Defendants' unlawful conspiracy

215.     Plaintiffs had no knowledge of the combination or conspiracy alleged herein, or of facts sufficient to place them on inquiry notice of the claims set forth herein, until (at the earliest) Defendants' disclosures of the existence of the government investigations and subpoenas. Prior to that time, no information in the public domain or available to Plaintiffs suggested that any Defendant was involved in a criminal conspiracy to fix prices for generic Doxycycline.

216.     In the case of Heritage, Mayne, Glazer and Malek, specifically, Plaintiffs had no knowledge of the combination or conspiracy alleged herein, or of facts sufficient to place them on inquiry notice of the claims set forth against these Defendants, until (at the earliest) the filing of the AG's Complaint and/or the filing of the criminal Informations against Glazer and Malek.

217.     No information evidencing antitrust violations was available in the public domain prior to the public announcements of the government investigations that revealed sufficient information to suggest that any of the defendants was involved in a criminal conspiracy to fix prices for generic Doxycycline.

218.     Plaintiffs are purchasers who indirectly purchased generic Doxycycline manufactured by one or more Defendants. They had no direct contact or interaction with any of the Defendants in this case and had no means from which they could have discovered Defendants' conspiracy.

219.   Defendants repeatedly and expressly stated throughout the Class Period, including on their public Internet websites, that they maintained antitrust/fair competition policies which prohibited the type of collusion alleged in this Complaint. For example:

(a)   Allergan's (predecessor to Actavis) Code of Conduct states: "We support a free and open market, which is why we comply with competition laws everywhere we do business and strive to always compete fairly."[87]

(b)   Mayne's Business Code of Conduct provides: "Do not agree, even informally, with competitors on price (or any elements of price including discounts or rebates), production, customers or markets without a lawful reason."[88]

(c)   Mylan's Code of Conduct and Business Ethics states: "Mylan is committed to complying with applicable antitrust and fair competition laws."[89]

(d)   Par's Code of Conduct provides: "It is Company policy to comply with the antitrust and competition laws of each country in which the Company does business."[90]

(e)   Sun Pharmaceutical Industries, Ltd.'s Global Code of Conduct provides: "We seek to outperform our competition fairly and honestly. We seek competitive advantages through superior performance, never through unethical or illegal business practices." It goes on to state: "Sun Pharma shall compete only in an ethical and legitimate manner and prohibits all actions that are anti-competitive or otherwise contrary to applicable competition or anti-trust laws."[91]

(f)   Hikma's (the parent of West-Ward) Code of Conduct provides: "Hikma will engage in free and fair competition and not seek competitive advantage through unlawful means. Hikma will not collude with competitors on prices,

---

[87] Allergan Code of Conduct, *available at* http://www.allergan.com/investors/corporate-governance/code-of-conduct

[88] Mayne Pharma Group Business Code of Conduct, *available at* https://www.maynepharma.com/media/1786/business-code-of-conduct.pdf

[89] Mylan Code of Business Conduct and Ethics, *available at* https://www.mylan.com/-/media/mylancom/files/code%20of%20business%20conduct%20and%20ethics.pdf

[90] Par Code of Ethics, *available at* http://corpdocs.msci.com/ethics/eth_19100.pdf.

[91] Sun Pharma Global Code of Conduct, *available at* http://www.sunpharma.com/Shareholder-Information/Policies/93092/Global-Code-of-Conduct

bids or market allocations, nor exchange information with third parties in a way that could improperly influence business outcomes."[92]

220.   It was reasonable for members of the Class to believe that Defendants were complying with their own antitrust policies.

221.   For these reasons, the statutes of limitations as to Plaintiffs' claims under the federal and state laws identified herein did not begin to run, and have been tolled with respect to the claims that Plaintiffs have alleged in this Complaint.

## B.   Fraudulent concealment tolled the statutes of limitations

222.   In the alternative, application of the doctrine of fraudulent concealment tolled the statutes of limitations on the claims asserted by Plaintiffs.  Plaintiffs had no knowledge of the combination or conspiracy alleged in this Complaint, or of facts sufficient to place them on inquiry notice of their claims, until Defendants disclosed the existence of government investigations and subpoenas. Prior to that time, no information in the public domain or available to Plaintiffs suggested that any Defendant was involved in a criminal conspiracy to fix prices for generic Doxycycline.

223.   In the case of Heritage, Mayne, Glazer and Malek, Plaintiffs had no knowledge of the combination or conspiracy alleged herein, or of facts sufficient to place them on inquiry notice of the claims set forth against these Defendants, until (at the earliest) the filing of the AG's Complaint and/or the filing of the criminal Informations against Glazer and Malek.

224.   No information evidencing antitrust violations was available in the public domain prior to the public announcements of the government investigations that revealed sufficient

---

[92] Hikma Code of Conduct, *available at* http://www.hikma.com/en/sustainability/Code-of-conduct.html

information to suggest that any of the defendants was involved in a criminal conspiracy to fix prices for generic Doxycycline.

225.     As described in more detail below, Defendants actively concealed, suppressed, and omitted to disclose material facts to Plaintiffs and members of the Classes concerning Defendants' unlawful activities to artificially inflate prices for generic Doxycycline. The concealed, suppressed, and omitted facts would have been important to Plaintiffs and members of the Classes as they related to the cost of generic Doxycycline they purchased. Defendants misrepresented the real cause of price increases and/or the absence of price reductions in generic Doxycycline. Defendants' false statements and conduct concerning the prices of generic Doxycycline were deceptive as they had the tendency or capacity to mislead Plaintiffs and members of the Classes to believe that they were purchasing generic Doxycycline at prices established by a free and fair market.

### 1.     Active concealment of the conspiracy

226.     Defendants engaged in an illegal scheme to fix prices, allocate customers and rig bids. Criminal and civil penalties for engaging in such conduct are severe.  Not surprisingly, Defendants took affirmative measures to conceal their conspiratorial conduct.

227.     Through their misleading, deceptive, false and fraudulent statements, Defendants effectively concealed their conspiracy, thereby causing economic harm to Plaintiffs and the Classes. Defendants' misrepresentations regarding their price changes were intended to lull Plaintiffs and the Classes into accepting the price hikes as a normal result of competitive and economic market trends rather than the consequences of Defendants' collusive acts. The public statements made by Defendants were designed to mislead Plaintiffs and the Classes into paying unjustifiably higher prices for generic Doxycycline.

228.    For example, Heritage executives took overt steps to conceal their illegal activity, and destroy evidence of any wrongdoing going back to at least 2012. This conduct included a concerted and conscious effort to destroy documents, instructions not to put incriminating evidence in writing, directives not to use email, and the deletion of incriminating text messages.

229.    Paragraphs 119-27 of the AG Complaint provides specific examples of these acts of fraudulent concealment with respect to Defendants Heritage and Mayne, including: (a) Glazer reminding Malek on June 26, 2014 not to put evidence of his illegal conduct in writing; (b) Heritage being instructed by a competitor not to communicate through e-mail but to instead communicate by telephone; (c) Malek sending a text message about how to avoid detection by regulators, which was not produced by Heritage in response to a subpoena by the Connecticut AG; (d) deletion of e-mails and text messages by Glazer, Malek, and other employees of Heritage regarding illegal communications with competitors; and (e) one of Mayne's key executives who participated in the conspiracy deleting several of the most incriminating text messages from her cellular telephone before the data on that telephone were imaged and produced to the Connecticut AG's office.

230.    As Jepsen said in the press release referenced above that was issued at the time that the AG Complaint was filed:  "[t]he states further allege that the drug companies knew that their conduct was illegal and made efforts to avoid communicating with each other in writing or, in some instances, to delete written communications after becoming aware of the investigation."93

231.    The Defendants also gave pretextual reasons for price increases. For example, during an August 11, 2015 earnings call, Dilip Shanghvi, the Managing Director at Sun Pharmaceutical Industries Ltd., misleadingly discussed "competitive pressure on some of the

---

93 http://www.ct.gov/ag/cwp/view.asp?Q=588538&A=2341.

products like … Doxycycline…where competitive intensity has increased," when in fact, Sun was engaged in a conspiracy to lessen competitive forces and inflate prices.94

232.   These types of false statements and others made by Defendants helped conceal the illegal conspiracy entered into by Defendants to fix, stabilize, maintain and raise the price of generic Doxycycline to inflated, supracompetitive levels.

233.   Through their misleading, deceptive, false and fraudulent statements, Defendants effectively concealed their conspiracy, thereby causing economic harm to Plaintiffs and the Classes. Defendants' misrepresentations regarding their price changes were intended to lull Plaintiffs and the Classes into accepting the price hikes as a normal result of competitive and economic market trends rather than as the consequence of Defendants' collusive acts. The public statements made by Defendants were designed to mislead Plaintiffs and the Classes into paying unjustifiably higher prices for generic Doxycycline.

234.   As explained in the State AG complaint, the nature of the generic drug industry— which allows for frequent and repeated face-to-face meetings among competitors—means that "Most of the conspiratorial communications were intentionally done in person or by cell phone, in an attempt to avoid creating a record of their illegal conduct. The generic drug industry, through the aforementioned opportunities to collude at trade shows, customer events and smaller more intimate dinners and meetings, allowed these communications to perpetuate."95

**2.     Plaintiffs exercised reasonable diligence**

235.   Defendants' anticompetitive conspiracy, by its very nature, was self-concealing. Generic drugs are not exempt from antitrust regulation, and thus, before the disclosure of the

---

[94] http://www.sunpharma.com/Media/Press-Releases/FY16%20Q1%20Earnings%20Call%20Transcript.pdf.

[95] State AG Amended Complaint ¶ 13.

government investigations, Plaintiffs reasonably considered the markets to be competitive. Accordingly, a reasonable person under the circumstances would not have been alerted to investigate the legitimacy of Defendants' prices before these disclosures.

236.   Because of the deceptive practices and techniques of secrecy employed by Defendants and their co-conspirators to conceal their illicit conduct, Plaintiffs and the Classes could not have discovered the conspiracy at an earlier date by the exercise of reasonable diligence.

237.   Therefore, the running of any statutes of limitations has been tolled for all claims alleged by Plaintiffs and the Classes as a result of Defendants' anticompetitive and unlawful conduct.  Despite the exercise of reasonable diligence, Plaintiffs and Members of the Classes were unaware of Defendants' unlawful conduct, and did not know that they were paying supracompetitive prices throughout the United States during the Class Period.

238.   For these reasons, Plaintiffs' claims are timely under all of the federal, state and common laws identified herein.

## IX.   <u>CONTINUING VIOLATIONS</u>

239.   This Complaint alleges a continuing course of conduct (including conduct within the limitations periods), and defendants' unlawful conduct has inflicted continuing and accumulating harm within the applicable statutes of limitations. As shown in the price charts above, Defendants continue to benefit from the effects of the conspiratorial price increases. Thus, Plaintiffs and the members of the Damages Class can recover for damages that they suffered during any applicable limitations period.

## X.   <u>DEFENDANTS' ANTITRUST VIOLATIONS</u>

240.   During the Class Period, set forth below, Defendants engaged in a continuing agreement, understanding, and conspiracy in restraint of trade to allocate customers, rig bids, and fix raise and/or stabilize prices for Doxycycline sold in the United States.

241.    In formulating and effectuating the contract, combination or conspiracy, Defendants identified above and their co-conspirators engaged in anticompetitive activities, the purpose and effect of which were to allocate customers, rig bids and artificially fix, raise, maintain, and/or stabilize the price of Doxycycline sold in the United States. These activities included the following:

(a)    Participating, directing, authorizing, or consenting to the participation of subordinate employees in meetings, conversations, and communications with co-conspirators to discuss the sale and pricing of Doxycycline in the United States;

(b)    Participating, directing, authorizing, or consenting to the participation of subordinate employees in meetings, conversations, and communications with co-conspirators to allocate customers or rig bids for Doxycycline sold in the United States;

(c)    Agreeing during those meetings, conversations, and communications to allocate customers for Doxycycline sold in the United States;

(d)    Agreeing during those meetings, conversations, and communications not to compete against each other for certain customers for Doxycycline sold in the United States;

(e)    Submitting bids, withholding bids, and issuing price proposal in accordance with the agreements reached;

(f)    Selling Doxycycline in the United States at collusive and noncompetitive prices; and

(g)    Accepting payment for Doxycycline sold in the United States at collusive and noncompetitive prices.

242.    Defendants and their co-conspirators engaged in the activities described above for the purpose of effectuating the unlawful agreements described in this Complaint.

243.    During and throughout the period of the conspiracy alleged in this Complaint, Plaintiffs and members of the Classes indirectly purchased Doxycycline at inflated and supracompetitive prices.

244.     Defendants' contract, combination and conspiracy constitutes an unreasonable restraint of trade and commerce in violation of Sections 1 and 3 of the Sherman Act (15 U.S.C. §§ 1, 3) and the laws of various IRP Damages Jurisdictions enumerated below.

245.     As a result of Defendants' unlawful conduct, Plaintiffs and the other members of the Classes have been injured in their business and property in that they have paid more for Doxycycline than they would have paid in competitive markets.

246.     General economic principles recognize that any overcharge at a higher level of distribution generally results in higher prices at every level below. Moreover, the institutional structure of pricing and regulation in the pharmaceutical drug industry assures that overcharges at the higher level of distribution are passed on to independent pharmacists, who cannot negotiate their acquisition costs. Wholesalers passed on the inflated prices to Plaintiffs and members of the Class. The impairment of generic competition at the direct purchaser level similarly injured Plaintiffs who were equally denied the opportunity to purchase less expensive generic versions of Doxycycline.

247.     The unlawful contract, combination and conspiracy has had the following effects, among others:

(a)     price competition in the market for Doxycycline has been artificially restrained;

(b)     prices for Doxycycline sold by Defendants have been raised, fixed, maintained, or stabilized at artificially high and non-competitive levels; and

(c)     purchasers of Doxycycline sold by Defendants have been deprived of the benefit of free and open competition in the market for Doxycycline.

# XI.    CLASS ACTION ALLEGATIONS

248.    Plaintiffs bring this action on behalf of themselves and as a class action under Rule 23(a) and (b)(2) of the Federal Rules of Civil Procedure, seeking equitable and injunctive relief on behalf of the following class (the "Nationwide Class"):

> All privately held pharmacies in the United States and its territories that indirectly purchased Defendants' generic Doxycycline Hyclate products (including regular release capsules (50 or 100mg) or tablets (100mg) or delayed release tablets (75, 100, and 150mg)) at any time during the period from November 1, 2012 through the present.

> This class excludes:  (a) defendants, their officers, directors, management, employees, subsidiaries and affiliates; (b) all persons or entities who purchased Doxycycline products directly from defendants; (c) any pharmacies owned in part by judges or justices involved in this action or any members of their immediate families; (d) all pharmacies owned or operated by publicly traded companies.

249.    Plaintiffs also bring this action on behalf of themselves and as a class action under Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure seeking damages pursuant to the common law of unjust enrichment and the state antitrust, unfair competition, and consumer protection laws of the states and territories listed below (the "IRP Damages Jurisdictions")[96] on behalf of the following class (the "Damages Class"):

> All privately held pharmacies in the IRP Damages Jurisdictions that indirectly purchased Defendants' generic Doxycycline Hyclate regular release capsules or tablets at any time from November 1, 2012 through the present.

---

[96] The IRP Damages Jurisdictions, for purposes of this complaint, are: Alabama, Alaska, Arizona, Arkansas, California, Colorado, Delaware, Florida, Georgia, Idaho, Illinois, Iowa, Kansas, Louisiana, Maine, Maryland, Massachusetts, Michigan, Minnesota, Mississippi, Missouri, Montana, Nebraska, Nevada, New Hampshire, New Jersey, New Mexico, New York, North Carolina, North Dakota, Oregon, Pennsylvania, Rhode Island, South Carolina, South Dakota, Tennessee, Texas, Utah, Vermont, Virginia, Washington, West Virginia, Wisconsin and Wyoming as well as the District of Columbia, Puerto Rico, and the U.S. Virgin Islands.

All privately held pharmacies in the IRP Damages Jurisdictions that indirectly purchased Defendants' generic Doxycycline Hyclate delayed release tablets at any time from April 1, 2013, through the present. [97]

This class excludes:  (a) defendants, their officers, directors, management, employees, subsidiaries and affiliates; (b) all persons or entities who purchased Doxycycline products directly from defendants; (c) any pharmacies owned in part by judges or justices involved in this action or any members of their immediate families; (d) all pharmacies owned or operated by publicly traded companies.

250. The Nationwide Class and the Damages Class are referred to herein as the "Classes."

251. While Plaintiffs do not know the exact number of the members of the Classes, rosters of members of national independent pharmacy organizations indicate that there are at least 20,000 members in each class.

252. Common questions of law and fact exist as to all members of the Classes. This is particularly true given the nature of Defendants' conspiracy, which was generally applicable to all the members of both Classes, thereby making appropriate relief with respect to the Classes as a whole. Such questions of law and fact common to the Classes include, but are not limited to:

(g)     Whether Defendants and their co-conspirators engaged in a combination and conspiracy among themselves to fix, raise, maintain and/or stabilize prices of generic Doxycycline and/or engaged in market allocation for generic Doxycycline sold in the United States;

(h)     The identity of the participants of the alleged conspiracy;

(i)     The duration of the alleged conspiracy and the acts carried out by Defendants and their co-conspirators in furtherance of the conspiracy;

(j)     Whether the alleged conspiracy violated the Sherman Act, as alleged in the First Count;

---

[97] Plaintiffs may seek to certify state classes rather than a single Damages Class. See ¶ 256.

(k)    Whether the alleged conspiracy violated state antitrust and unfair competition laws, and/or state consumer protection laws, as alleged in the Second and Third Counts;

(l)    Whether Defendants unjustly enriched themselves to the detriment of the Plaintiffs and the members of the Classes, thereby entitling Plaintiffs and the members of the Classes to disgorgement of all benefits derived by Defendants, as alleged in the Fourth Count;

(m)    Whether the conduct of Defendants and their co-conspirators, as alleged in this Complaint, caused injury to the business or property of Plaintiffs and the members of the Classes;

(n)    The effect of the alleged conspiracy on the prices of generic Doxycycline sold in the United States during the Class Period;

(o)    Whether the Defendants and their co-conspirators actively concealed, suppressed, and omitted to disclose material facts to Plaintiffs and members of the Classes concerning Defendants' unlawful activities to artificially inflate prices for generic Doxycycline, and/or fraudulently concealed the unlawful conspiracy's existence from Plaintiffs and the other members of the Classes;

(p)    The appropriate injunctive and related equitable relief for the Nationwide Class; and

(q)    The appropriate class-wide measure of damages for the Damages Class.

253.    Plaintiffs' claims are typical of the claims of the members of the Classes.   Plaintiffs and all members of the Classes are similarly affected by Defendants' wrongful conduct in that they paid artificially inflated prices for generic Doxycycline purchased indirectly from Defendants and/or their co-conspirators. Plaintiffs' claims arise out of the same common course of conduct giving rise to the claims of the other members of the Classes.

254.    Plaintiffs will fairly and adequately protect the interests of the Classes. Plaintiffs' interests are coincident with, and not antagonistic to, those of the other members of the Classes. Plaintiffs are represented by counsel who are competent and experienced in the prosecution of antitrust and class action litigation.

255.    The questions of law and fact common to the members of the Classes predominate over any questions affecting only individual members, including legal and factual issues relating to liability and damages.

256.    Class action treatment is a superior method for the fair and efficient adjudication of the controversy, in that, among other things, such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently and without the unnecessary duplication of evidence, effort and expense that numerous individual actions would engender. The benefits of proceeding through the class mechanism, including providing injured persons or entities with a method for obtaining redress for claims that might not be practicable to pursue individually, substantially outweigh any difficulties that may arise in management of this class action. Plaintiffs reserve the discretion to certify the Damages Class as separate classes for each of the IRP Damages Jurisdictions or as separate classes for certain groups of IRP Damages Jurisdictions, should the Court's subsequent decisions in this case render that approach more efficient. Whether certified together or separately, the total number and identity of the members of the Damages Class would remain consistent.

257.    The prosecution of separate actions by individual members of the Classes would create a risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendants.

## XII.    CAUSES OF ACTION

### FIRST COUNT

**Violation Of Sections 1 And 3 Of The Sherman Act
(on behalf of Plaintiffs and the Nationwide Class)**

268.    Plaintiffs incorporate by reference the allegations set forth above as if fully set forth herein.

269.    Defendants and their unnamed co-conspirators entered into and engaged in a contract, combination, or conspiracy in unreasonable restraint of trade in violation of Sections 1 and 3 of the Sherman Act (15 U.S.C. § 1, 3).

270.    During the Class Period, Defendants and their co-conspirators entered into a continuing agreement, understanding and conspiracy in restraint of trade to artificially allocate customers, rig bids and raise, maintain and fix prices for generic Doxycycline, thereby creating anticompetitive effects.

271.    The conspiratorial acts and combinations have caused unreasonable restraints in the market for generic Doxycycline.

272.    As a result of Defendants' unlawful conduct, Plaintiffs and other similarly situated independent pharmacies in the Nationwide Class who purchased generic Doxycycline have been harmed by being forced to pay inflated, supracompetitive prices for generic Doxycycline.

273.    In formulating and carrying out the alleged agreement, understanding and conspiracy, Defendants and their co-conspirators did those things that they combined and conspired to do, including, but not limited to, the acts, practices and course of conduct set forth herein.

274.    Defendants' conspiracy had the following effects, among others:

(a)    Price competition in the market for generic Doxycycline has been restrained, suppressed, and/or eliminated in the United States;

(b)    Prices for generic Doxycycline provided by Defendants and their co-conspirators have been fixed, raised, maintained, and stabilized at artificially high, non-competitive levels throughout the United States; and

(c)    Plaintiffs and members of the Nationwide Class who purchased generic Doxycycline indirectly from Defendants and their co-conspirators have been deprived of the benefits of free and open competition.

275. Plaintiffs and members of the Nationwide Class have been injured and will continue to be injured in their business and property by paying more for generic Doxycycline purchased indirectly from Defendants and the co-conspirators than they would have paid and will pay in the absence of the conspiracy.

276. Defendants' contract, combination, or conspiracy is a *per se* violation of the federal antitrust laws.

277. Plaintiffs and members of the Nationwide Class are entitled to an injunction against Defendants, preventing and restraining the continuing violations alleged herein.

## <u>SECOND COUNT</u>

### <u>Violation Of State Antitrust Statutes[98]</u><br>(<u>on behalf of Plaintiffs and the Damages Class</u>)

278. Plaintiffs incorporate by reference the allegations set forth above as if fully set forth herein.

279. During the Class Period, Defendants and their co-conspirators engaged in a continuing contract, combination or conspiracy with respect to the sale of generic Doxycycline in unreasonable restraint of trade and commerce and in violation of the various state antitrust and other statutes set forth below.

280. The contract, combination, or conspiracy consisted of an agreement among Defendants and their co-conspirators to fix, raise, inflate, stabilize, and/or maintain the prices of generic Doxycycline and to allocate customers for generic Doxycycline in the United States.

---

[98] Statutory antitrust violations are alleged herein for the following jurisdictions: Alabama, Arizona, California, District of Columbia, Illinois, Iowa, Kansas, Maine, Michigan, Minnesota, Mississippi, Nebraska, Nevada, New Hampshire, New Mexico, New York, North Carolina, North Dakota, Oregon, Rhode Island, South Dakota, Tennessee, Utah, Vermont, West Virginia and Wisconsin.

281.    In formulating and effectuating this conspiracy, Defendants and their co-conspirators performed acts in furtherance of the combination and conspiracy, including:

(a)    participating in meetings and conversations among themselves in the United States and elsewhere during which they agreed to price generic Doxycycline at certain levels, and otherwise to fix, increase, inflate, maintain, or stabilize effective prices paid by Plaintiffs and members of the Damages Class with respect to generic Doxycycline provided in the United States; and

(b)    participating in meetings and trade association conversations among themselves in the United States and elsewhere to implement, adhere to, and police the unlawful agreements they reached.

282.    Defendants and their co-conspirators engaged in the actions described above for the purpose of carrying out their unlawful agreement to allocate customers, rig bids, and fix prices for generic Doxycycline. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

283.    In addition, defendants have profited significantly from the conspiracy. Defendants' profits derived from their anticompetitive conduct come at the expense and detriment of plaintiffs and the members of the Damages Class.

284.    Accordingly, plaintiffs and the members of the Damages Class in each of the following jurisdictions seek damages (including statutory damages where applicable), to be trebled or otherwise increased as permitted by a particular jurisdiction's antitrust law, and costs of suit, including reasonable attorneys' fees, to the extent permitted by the following state laws.

285.    Defendants' anticompetitive acts described above were knowing, willful and constitute violations or flagrant violations of the following state antitrust statutes:

286.    **Alabama:** Defendants have entered into an unlawful agreement in restraint of trade in violation of Alabama Code § 6-5-60, et seq. Defendants' combinations and conspiracy had the

following effects: (1) price competition for generic Doxycycline was restrained, suppressed, and eliminated throughout Alabama; (2) generic Doxycycline prices were raised, fixed, maintained and stabilized at artificially high levels throughout Alabama. During the Class Period, Defendants' illegal conduct substantially affected Alabama commerce. By reason of the foregoing, Defendants entered into an agreement in restraint of trade in violation of Alabama Code § 6-5-60, et seq. Accordingly, Plaintiffs and members of the Damages Class seek all forms of relief available under Alabama Code § 6-5-60, et seq.

287.   **Arizona:** Defendants have entered into an unlawful agreement in restraint of trade in violation of Arizona Revised Statutes, § 44-1401, et seq. Defendants' combination and conspiracy had the following effects: (1) price competition for generic Doxycycline was restrained, suppressed, and eliminated throughout Arizona; (2) generic Doxycycline prices were raised, fixed, maintained and stabilized at artificially high levels throughout Arizona. During the Class Period, Defendants' illegal conduct substantially affected Arizona commerce. Defendants' violations of Arizona law were flagrant.  As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants entered into an agreement in restraint of trade in violation of Ariz. Rev. Stat. § 44-1401, et seq. Accordingly, Plaintiffs and members of the Damages Class seek all forms of relief available under Ariz. Rev. Stat. § 44-1401, et seq.

288.   **California:** Defendants have entered into an unlawful agreement in restraint of trade in violation of California Business and Professions Code § 16700 et seq. During the Class Period, Defendants and their co-conspirators entered into and engaged in a continuing unlawful trust in restraint of the trade and commerce described above in violation of California Business

and Professions Code §16720. Defendants, and each of them, have acted in violation of § 16720 to fix, raise, stabilize, and maintain prices of generic Doxycycline at supracompetitive levels. The aforesaid violations of § 16720 consisted, without limitation, of a continuing unlawful trust and concert of action among Defendants and their co-conspirators, the substantial terms of which were to fix, raise, maintain, and stabilize the prices of generic Doxycycline. For the purpose of forming and effectuating the unlawful trust, Defendants and their co-conspirators have done those things which they combined and conspired to do, including, but not limited to, the acts, practices and course of conduct set forth above and creating a price floor, fixing, raising, and stabilizing the price of generic Doxycycline. The combination and conspiracy alleged herein has had, inter alia, the following effects: (1) price competition for generic Doxycycline has been restrained, suppressed, and/or eliminated in the State of California; (2) prices for generic Doxycycline provided by Defendants and their co-conspirators have been fixed, raised, stabilized, and pegged at artificially high, non-competitive levels in the State of California; and (3) those who purchased generic Doxycycline indirectly from Defendants and their co-conspirators have been deprived of the benefit of free and open competition. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property in that they paid more for generic Doxycycline than they otherwise would have paid in the absence of Defendants' unlawful conduct. During the Class Period, Defendants' illegal conduct substantially affected California commerce. As a result of Defendants' violation of § 16720, Plaintiffs and members of the Damages Class seek treble damages and their cost of suit, including a reasonable attorney's fee, pursuant to California Business and Professions Code § 16750(a).

289.   **District of Columbia:** Defendants have entered into an unlawful agreement in restraint of trade in violation of District of Columbia Code Annotated § 28-4501, et seq.

Defendants' combination and conspiracy had the following effects: (1) generic Doxycycline price competition was restrained, suppressed, and eliminated throughout the District of Columbia; (2) generic Doxycycline prices were raised, fixed, maintained and stabilized at artificially high levels throughout the District of Columbia; (3) Plaintiffs and members of the Damages Class, including those who resided in the District of Columbia and/or purchased generic Doxycycline in the District of Columbia that were shipped by Defendants or their co-conspirators into the District of Columbia, were deprived of free and open competition, including in the District of Columbia; and (4) Plaintiffs and members of the Damages Class, including those who resided in the District of Columbia and/or purchased generic Doxycycline in the District of Columbia that were shipped by Defendants or their co-conspirators, paid supracompetitive, artificially inflated prices for generic Doxycycline, including in the District of Columbia. During the Class Period, Defendants' illegal conduct substantially affected District of Columbia commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of District of Columbia Code Ann. § 28-4501, et seq. Accordingly, Plaintiffs and members of the Damages Class seek all forms of relief available under District of Columbia Code Ann. § 28-4501, et seq.

290. **Illinois:** Defendants have entered into an unlawful agreement in restraint of trade in violation of the Illinois Antitrust Act (740 Illinois Compiled Statutes 10/1, et seq.) Defendants' combination or conspiracy had the following effects: (1) generic Doxycycline price competition was restrained, suppressed, and eliminated throughout Illinois; (2) generic Doxycycline prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Illinois. During the Class Period, Defendants' illegal conduct substantially affected Illinois commerce. As a direct

and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. Accordingly, Plaintiffs and members of the Damages Class seek all forms of relief available under the Illinois Antitrust Act.

291.   **Iowa:** Defendants have entered into an unlawful agreement in restraint of trade in violation of Iowa Code § 553.1, et seq. Defendants' combination or conspiracy had the following effects: (1) generic Doxycycline price competition was restrained, suppressed, and eliminated throughout Iowa; (2) generic Doxycycline prices were raised, fixed, maintained and stabilized at artificially high levels throughout Iowa. During the Class Period, Defendants' illegal conduct substantially affected Iowa commerce. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of Iowa Code § 553.1, et seq. Accordingly, Plaintiffs and members of the Damages Class seek all forms of relief available under Iowa Code § 553, et seq.

292.   **Kansas:** Defendants have entered into an unlawful agreement in restraint of trade in violation of Kansas Statutes Annotated, § 50-101, et seq. Defendants' combined capital, skills or acts for the purposes of creating restrictions in trade or commerce of generic Doxycycline, increasing the prices of generic Doxycycline, preventing competition in the sale of generic Doxycycline, or binding themselves not to sell generic Doxycycline, in a manner that established the price of generic Doxycycline and precluded free and unrestricted competition among themselves in the sale of generic Doxycycline, in violation of Kan. Stat. Ann. § 50-101, et seq. Defendants' combination or conspiracy had the following effects: (1) generic Doxycycline price competition was restrained, suppressed, and eliminated throughout Kansas; (2) generic Doxycycline prices were raised, fixed, maintained and stabilized at artificially high levels

throughout Kansas. During the Class Period, Defendants' illegal conduct substantially affected Kansas commerce. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of Kansas Stat. Ann. § 50-101, et seq. Accordingly, Plaintiffs and members of the Damages Class seek all forms of relief available under Kansas Stat. Ann. § 50-101, et seq.

293.   **Maine:** Defendants have entered into an unlawful agreement in restraint of trade in violation of Maine Revised Statutes (Maine Rev. Stat. Ann. 10, § 1101, et seq.) Defendants' combination or conspiracy had the following effects: (1) generic Doxycycline price competition was restrained, suppressed, and eliminated throughout Maine; (2) generic Doxycycline prices were raised, fixed, maintained and stabilized at artificially high levels throughout Maine. During the Class Period, Defendants' illegal conduct substantially affected Maine commerce. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of Maine Rev. Stat. Ann. 10, § 1101, et seq. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Maine Rev. Stat. Ann. 10, § 1101, et seq.

294.   **Michigan:** Defendants have entered into an unlawful agreement in restraint of trade in violation of Michigan Compiled Laws Annotated § 445.771, et seq. Defendants' combination or conspiracy had the following effects: (1) generic Doxycycline price competition was restrained, suppressed, and eliminated throughout Michigan; (2) generic Doxycycline prices were raised, fixed, maintained and stabilized at artificially high levels throughout Michigan. During the Class Period, Defendants' illegal conduct substantially affected Michigan commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of

Michigan Comp. Laws Ann. § 445.771, et seq. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Michigan Comp. Laws Ann. § 445.771, et seq.

295.   **Minnesota:** Defendants have entered into an unlawful agreement in restraint of trade in violation of Minnesota Annotated Statutes § 325D.49, et seq. Defendants' combination or conspiracy had the following effects: (1) generic Doxycycline price competition was restrained, suppressed, and eliminated throughout Minnesota; (2) generic Doxycycline prices were raised, fixed, maintained and stabilized at artificially high levels throughout Minnesota. During the Class Period, Defendants' illegal conduct substantially affected Minnesota commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of Minnesota Stat. § 325D.49, et seq. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Minnesota Stat. § 325D.49, et seq.

296.   **Mississippi:** Defendants have entered into an unlawful agreement in restraint of trade in violation of Mississippi Code Annotated § 75-21-1, et seq. Trusts are combinations, contracts, understandings or agreements, express or implied when inimical to the public welfare and with the effect of, inter alia, restraining trade, increasing the price or output of a commodity, or hindering competition in the production and sale of a commodity. Miss. Code Ann. § 75-21-1. Defendants' combination or conspiracy was in a manner inimical to public welfare and had the following effects: (1) generic Doxycycline price competition was restrained, suppressed, and eliminated throughout Mississippi; (2) generic Doxycycline prices were raised, fixed, maintained and stabilized at artificially high levels throughout Mississippi. During the Class Period, Defendants' illegal conduct substantially affected Mississippi commerce. As a direct and

proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of Mississippi Code Ann. § 75-21-1, et seq. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Mississippi Code Ann. § 75-21-1, et seq.

297.   **Nebraska:** Defendants have entered into an unlawful agreement in restraint of trade in violation of Nebraska Revised Statutes § 59-801, et seq. Defendants' combination or conspiracy had the following effects: (1) generic Doxycycline price competition was restrained, suppressed, and eliminated throughout Nebraska; (2) generic Doxycycline prices were raised, fixed, maintained and stabilized at artificially high levels throughout Nebraska. During the Class Period, Defendants' illegal conduct substantially affected Nebraska commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of Nebraska Revised Statutes § 59-801, et seq. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Nebraska Revised Statutes § 59-801, et seq.

298.   **Nevada:** Defendants have entered into an unlawful agreement in restraint of trade in violation of Nevada Revised Statutes Annotated § 598A.010, et seq. Defendants' combination or conspiracy had the following effects: (1) generic Doxycycline price competition was restrained, suppressed, and eliminated throughout Nevada; (2) generic Doxycycline prices were raised, fixed, maintained and stabilized at artificially high levels throughout Nevada. During the Class Period, Defendants' illegal conduct substantially affected Nevada commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been

injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of Nevada Rev. Stat. Ann. § 598A.010, et seq. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Nevada Rev. Stat. Ann. § 598A.010, et seq.

299.     **New Hampshire:** Defendants have entered into an unlawful agreement in restraint of trade in violation of New Hampshire Revised Statutes § 356:1, et seq. Defendants' combination or conspiracy had the following effects: (1) generic Doxycycline price competition was restrained, suppressed, and eliminated throughout New Hampshire; (2) generic Doxycycline prices were raised, fixed, maintained and stabilized at artificially high levels throughout New Hampshire. During the Class Period, Defendants' illegal conduct substantially affected New Hampshire commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of New Hampshire Revised Statutes § 356:1, et seq. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under New Hampshire Revised Statutes § 356:1, et seq.

300.     **New Mexico:** Defendants have entered into an unlawful agreement in restraint of trade in violation of New Mexico Statutes Annotated § 57-1-1, et seq. Defendants' combination or conspiracy had the following effects: (1) generic Doxycycline price competition was restrained, suppressed, and eliminated throughout New Mexico; (2) generic Doxycycline prices were raised, fixed, maintained and stabilized at artificially high levels throughout New Mexico. During the Class Period, Defendants' illegal conduct substantially affected New Mexico commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the

Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of New Mexico Stat. Ann. § 57-1-1, et seq. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under New Mexico Stat. Ann. § 57-1-1, et seq.

301.   **New York:** Defendants have entered into an unlawful agreement in restraint of trade in violation of New York General Business Law § 340, et seq. Defendants' combination or conspiracy had the following effects: (1) generic Doxycycline price competition was restrained, suppressed, and eliminated throughout New York; (2) generic Doxycycline prices were raised, fixed, maintained and stabilized at artificially high levels throughout New York that were higher than they would have been absent Defendants' illegal acts. During the Class Period, Defendants' illegal conduct substantially affected New York commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of New York General Business Law § 340, et seq. The conduct set forth above is a per se violation of the Act. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under New York Gen. Bus. Law § 340, et seq.

302.   **North Carolina:** Defendants have entered into an unlawful agreement in restraint of trade in violation of the North Carolina General Statutes § 75-1, et seq. Defendants' combination or conspiracy had the following effects: (1) generic Doxycycline price competition was restrained, suppressed, and eliminated throughout North Carolina; (2) generic Doxycycline prices were raised, fixed, maintained and stabilized at artificially high levels throughout North Carolina. During the Class Period, Defendants' illegal conduct substantially affected North Carolina commerce. As a

direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of North Carolina Gen. Stat. § 75-1, et seq. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under North Carolina Gen. Stat. § 75-1, et. seq.

303.   **North Dakota:** Defendants have entered into an unlawful agreement in restraint of trade in violation of North Dakota Century Code § 51-08.1-01, et seq. Defendants' combination or conspiracy had the following effects: (1) generic Doxycycline price competition was restrained, suppressed, and eliminated throughout North Dakota; (2) generic Doxycycline prices were raised, fixed, maintained and stabilized at artificially high levels throughout North Dakota. During the Class Period, Defendants' illegal conduct had a substantial effect on North Dakota commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of North Dakota Cent. Code § 51-08.1-01, et seq. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under North Dakota Cent. Code § 51-08.1-01, et seq.

304.   **Oregon:** Defendants have entered into an unlawful agreement in restraint of trade in violation of Oregon Revised Statutes § 646.705, et seq. Defendants' combination or conspiracy had the following effects: (1) generic Doxycycline price competition was restrained, suppressed, and eliminated throughout Oregon; (2) generic Doxycycline prices were raised, fixed, maintained and stabilized at artificially high levels throughout Oregon. During the Class Period, Defendants' illegal conduct had a substantial effect on Oregon commerce. As a direct and proximate result of

Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of Oregon Revised Statutes § 646.705, et seq. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Oregon Revised Statutes § 646.705, et seq.

305.   **Rhode Island:** Defendants have entered into an unlawful agreement in restraint of trade in violation of the Rhode Island Antitrust Act, Rhode Island General Laws § 6-36-1, et seq. Defendants' combination or conspiracy had the following effects: (1) generic Doxycycline price competition was restrained, suppressed, and eliminated throughout Rhode Island; (2) generic Doxycycline prices were raised, fixed, maintained and stabilized at artificially high levels throughout Rhode Island. During the Class Period, Defendants' illegal conduct had a substantial effect on Rhode Island commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property on or after July 15, 2013, and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of Rhode Island General Laws § 6-36-1, et seq. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Rhode Island General Laws § 6-36-1, et seq.

306.   **South Dakota:** Defendants have entered into an unlawful agreement in restraint of trade in violation of South Dakota Codified Laws § 37-1-3.1, et seq. Defendants' combination or conspiracy had the following effects: (1) generic Doxycycline price competition was restrained, suppressed, and eliminated throughout South Dakota; (2) generic Doxycycline prices were raised, fixed, maintained and stabilized at artificially high levels throughout South Dakota. During the Class Period, Defendants' illegal conduct had a substantial effect on South Dakota commerce. As

a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of South Dakota Codified Laws Ann. § 37-1-3.1, et seq. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under South Dakota Codified Laws Ann. § 37-1-3.1, et seq.

307.   **Tennessee:** Defendants have entered into an unlawful agreement in restraint of trade in violation of Tennessee Code Annotated § 47-25-101, et seq. Defendants' combination or conspiracy had the following effects: (1) generic Doxycycline price competition was restrained, suppressed, and eliminated throughout Tennessee; (2) generic Doxycycline prices were raised, fixed, maintained and stabilized at artificially high levels throughout Tennessee. During the Class Period, Defendants' illegal conduct had a substantial effect on Tennessee commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of Tennessee Code Ann. § 47-25-101, et seq. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Tennessee Code Ann. § 47-25-101, et seq.

308.   **Utah:** Defendants have entered into an unlawful agreement in restraint of trade in violation of Utah Code Annotated § 76-10-3101, et seq. Defendants' combination or conspiracy had the following effects: (1) generic Doxycycline price competition was restrained, suppressed, and eliminated throughout Utah; (2) generic Doxycycline prices were raised, fixed, maintained and stabilized at artificially high levels throughout Utah. During the Class Period, Defendants' illegal conduct had a substantial effect on Utah commerce. As a direct and proximate result of

Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of Utah Code Annotated § 76-10-3101, et seq. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Utah Code Annotated § 76-10-3101, et seq.

309.    **Vermont:** Defendants have entered into an unlawful agreement in restraint of trade in violation of Vermont Stat. Ann. 9 § 2453, et seq. Defendants' combination or conspiracy had the following effects: (1) generic Doxycycline price competition was restrained, suppressed, and eliminated throughout Vermont; (2) generic Doxycycline prices were raised, fixed, maintained and stabilized at artificially high levels throughout Vermont. During the Class Period, Defendants' illegal conduct had a substantial effect on Vermont commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of Vermont Stat. Ann. 9 § 2453, et seq. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Vermont Stat. Ann. 9 § 2453, et seq.

310.    **West Virginia:** Defendants have entered into an unlawful agreement in restraint of trade in violation of West Virginia Code § 47-18-1, et seq. Defendants' anticompetitive acts described above were knowing, willful, and constitute violations or flagrant violations of West Virginia Antitrust Act. Defendants' combination or conspiracy had the following effects: (1) generic Doxycycline price competition was restrained, suppressed, and eliminated throughout West Virginia; (2) generic Doxycycline prices were raised, fixed, maintained and stabilized at artificially high levels throughout West Virginia. During the Class Period, Defendants' illegal

conduct had a substantial effect on West Virginia commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of West Virginia Code § 47-18-1, et seq. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under West Virginia Code § 47-18-1, et seq.

311.   **Wisconsin:** Defendants have entered into an unlawful agreement in restraint of trade in violation of the Wisconsin Statutes § 133.01, et seq. Defendants' and their co-conspirators' anticompetitive activities have directly, foreseeably and proximately caused injury to Plaintiffs and members of the Classes in the United States. Specifically, Defendants' combination or conspiracy had the following effects: (1) generic Doxycycline price competition was restrained, suppressed, and eliminated throughout Wisconsin; (2) generic Doxycycline prices were raised, fixed, maintained and stabilized at artificially high levels throughout Wisconsin.  During the Class Period, Defendants' illegal conduct had a substantial effect on the people of Wisconsin and Wisconsin commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of Wisconsin Stat. § 133.01, et seq. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Wisconsin Stat. § 133.01, et seq.

312.   **As to All Jurisdictions Above:** Plaintiffs and members of the Damages Class in each of the above jurisdictions have been injured in their business and property by reason of Defendants' unlawful combination, contract, conspiracy and agreement. Plaintiffs and members

of the Damages Class have paid more for generic Doxycycline than they otherwise would have paid in the absence of Defendants' unlawful conduct. This injury is of the type the antitrust laws of the above states were designed to prevent and flows from that which makes Defendants' conduct unlawful.

313.    In addition, Defendants have profited significantly from the aforesaid conspiracy. Defendants' profits derived from their anticompetitive conduct come at the expense and detriment of Plaintiffs and members of the Damages Class.

314.    Accordingly, Plaintiffs and members of the Damages Class in each of the above jurisdictions seek damages (including statutory damages where applicable), to be trebled or otherwise increased as permitted by a particular jurisdiction's antitrust law, and costs of suit, including reasonable attorneys' fees, to the extent permitted by the above state laws.

## THIRD COUNT

### Violation Of State Consumer Protection Statutes[99]
### (on behalf of Plaintiffs and the Damages Class)

315.    Plaintiffs incorporate by reference the allegations set forth above as if fully set forth herein.

316.    Defendants engaged in unfair competition or unfair, unconscionable, deceptive or fraudulent acts or practices in violation of the state consumer protection and unfair competition statutes listed below.

---

[99] Statutory consumer protection / deceptive trade violations are alleged herein for the following jurisdictions: Alaska, Arkansas, California, Colorado, Delaware, Florida, Georgia, Michigan, Minnesota, Nebraska, Nevada, New Hampshire, New Jersey, New Mexico, New York, North Carolina, North Dakota, South Carolina, South Dakota, West Virginia, Wisconsin and the U.S. Virgin Islands.

317.    **Alaska:** Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of Alaska Statute § 45.50.471, *et seq*.  Defendants knowingly agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling, and/or maintaining at non-competitive and artificially inflated levels, the prices at which generic Doxycycline were sold, distributed, or obtained in Alaska and took efforts to conceal their agreements from Plaintiffs and members of the Damages Class. The aforementioned conduct on the part of Defendants constituted "unconscionable" and "deceptive" acts or practices in violation of Alaska law.  Defendants' unlawful conduct had the following effects: (1) generic Doxycycline price competition was restrained, suppressed, and eliminated throughout Alaska; (2) generic Doxycycline prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Alaska. During the Class Period, Defendants' illegal conduct substantially affected Alaska commerce and consumers. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Alaska Stat. § 45.50.471, *et seq*., and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

318.    **Arkansas:** Defendants have knowingly entered into an unlawful agreement in restraint of trade in violation of the Arkansas Code Annotated, § 4-88-101, *et seq*. Defendants knowingly agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling, and/or maintaining at non-competitive and artificially inflated levels, the prices at which generic Doxycycline were sold, distributed, or obtained in Arkansas and took efforts to conceal their agreements from Plaintiffs and members of the Damages Class. The aforementioned conduct on the part of Defendants constituted "unconscionable" and "deceptive" acts or practices in violation of Arkansas Code Annotated, § 4-88-107(a)(10). Defendants' unlawful conduct had the following effects: (1) generic Doxycycline price competition was restrained, suppressed, and

eliminated throughout Arkansas; (2) generic Doxycycline prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Arkansas. During the Class Period, Defendants' illegal conduct substantially affected Arkansas commerce and consumers. As a direct and proximate result of the unlawful conduct of Defendants, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Arkansas Code Annotated, § 4-88-107(a)(10) and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

319. **California:** Defendants have engaged in unfair competition or unfair, unconscionable, deceptive or fraudulent acts or practices in violation of California Business and Professions Code § 17200, *et seq*. During the Class Period, Defendants manufactured, marketed, sold, or distributed generic Doxycycline in California, and committed and continue to commit acts of unfair competition, as defined by § 17200, *et seq*. of the California Business and Professions Code, by engaging in the acts and practices specified above. This claim is instituted pursuant to §§ 17203 and 17204 of the California Business and Professions Code, to obtain restitution from these Defendants for acts, as alleged herein, that violated § 17200 of the California Business and Professions Code, commonly known as the Unfair Competition Law. Defendants' conduct as alleged herein violated § 17200. The acts, omissions, misrepresentations, practices and non-disclosures of Defendants, as alleged herein, constituted a common, continuous, and continuing course of conduct of unfair competition by means of unfair, unlawful, and/or fraudulent business acts or practices within the meaning of California Business and Professions Code §17200, *et seq*., including, but not limited to, the following: (1) the violations of Section 1 of the Sherman Act, as set forth above; (2) the violations of § 16720, *et seq*. of the California Business and Professions

Code, set forth above. Defendants' acts, omissions, misrepresentations, practices, and non-disclosures, as described above, whether or not in violation of § 16720, *et seq*. of the California Business and Professions Code, and whether or not concerted or independent acts, are otherwise unfair, unconscionable, unlawful or fraudulent; (3) Defendants' acts or practices are unfair to purchasers of generic Doxycycline in the State of California within the meaning of § 17200, California Business and Professions Code; and (4) Defendants' acts and practices are fraudulent or deceptive within the meaning of Section 17200 of the California Business and Professions Code. Plaintiffs and members of the Damages Class are entitled to full restitution and/or disgorgement of all revenues, earnings, profits, compensation, and benefits that have been obtained by Defendants as a result of such business acts or practices. During the Class Period, Defendants' illegal conduct substantially affected California commerce and consumers. The illegal conduct alleged herein is continuing and there is no indication that Defendants will not continue such activity into the future. The unlawful and unfair business practices of Defendants, and each of them, as described above, have caused and continue to cause Plaintiffs and members of the Damages Class to pay supracompetitive and artificially-inflated prices for generic Doxycycline. Plaintiffs and members of the Damages Class suffered injury in fact and lost money or property as a result of such unfair competition. The conduct of Defendants as alleged in this Complaint violates § 17200 of the California Business and Professions Code. As alleged in this Complaint, Defendants and their co-conspirators have been unjustly enriched as a result of their wrongful conduct and by Defendants' unfair competition. Plaintiffs and members of the Damages Class are accordingly entitled to equitable relief including restitution and/or disgorgement of all revenues, earnings,

profits, compensation, and benefits that may have been obtained by Defendants as a result of such business practices, pursuant to the California Business and Professions Code, §§17203 and 17204.

320.  **Colorado:** Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of Colorado Consumer Protection Act, Colorado Rev. Stat. § 6-1-101, *et seq*.  Defendants engaged in an unfair and deceptive trade practices during the course of their business dealings, which significantly impacted Plaintiffs as actual or potential consumers of the Defendants' goods and which caused Plaintiffs to suffer injury. Defendants took efforts to conceal their agreements from Plaintiffs. Defendants' unlawful conduct had the following effects: (1) generic Doxycycline price competition was restrained, suppressed, and eliminated throughout Colorado; (2) generic Doxycycline prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Colorado. During the Class Period, Defendants' illegal conduct substantially affected Colorado commerce and consumers. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Colorado Rev. Stat. § 6-1-101, *et seq*., and, accordingly, Plaintiffs and members of the Class seek all relief available under that statute and as equity demands.

321.  **Delaware:** Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Delaware Consumer Fraud Act, 6 Del. Code § 2511, *et seq*.  Defendants agreed to, and did in fact, act in restraint of trade or commerce in Delaware, by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which generic Doxycycline were sold, distributed, or obtained in Delaware. Defendants deliberately failed to disclose material facts to Plaintiffs and members of the Damages Class concerning Defendants' unlawful activities and artificially inflated prices for generic Doxycycline. Defendants misrepresented to all purchasers during the Class Period that

Defendants' generic Doxycycline prices were competitive and fair. Defendants' unlawful conduct had the following effects: (1) generic Doxycycline price competition was restrained, suppressed, and eliminated throughout Delaware; (2) generic Doxycycline prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Delaware. During the Class Period, Defendants' illegal conduct had a substantial effect on Delaware commerce and consumers. As a direct and proximate result of Defendants' violations of law, Plaintiffs and members of the Damages Class suffered an ascertainable loss of money or property as a result of Defendants' use or employment of unconscionable and deceptive commercial practices as set forth above. That loss was caused by Defendants' willful and deceptive conduct, as described herein. Defendants' deception, including their affirmative misrepresentations and omissions concerning the price of generic Doxycycline, likely misled all purchasers acting reasonably under the circumstances to believe that they were purchasing generic Doxycycline at prices set by a free and fair market. Defendants' misleading conduct and unconscionable activities constitute violations of 6 Del. Code § 2511, *et seq.*, and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

322. **Florida:** Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. § 501.201, *et seq*. Defendants' unlawful conduct had the following effects: (1) generic Doxycycline price competition was restrained, suppressed, and eliminated throughout Florida; (2) generic Doxycycline prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Florida. During the Class Period, Defendants' illegal conduct substantially affected Florida commerce and consumers. Defendants have engaged in unfair competition or unfair or

deceptive acts or practices in violation of Florida Stat. § 501.201, *et seq*., and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

323.  **Georgia:** Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Georgia Uniform Deceptive Trade Practices Act, Georgia Code § 10-1-370, *et seq*.  Defendants agreed to, and did in fact, act in restraint of trade or commerce in Georgia, by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which generic Doxycycline were sold, distributed, or obtained in Georgia. Defendants deliberately failed to disclose material facts to Plaintiffs and members of the Damages Class concerning Defendants' unlawful activities and artificially inflated prices for generic Doxycycline. Defendants misrepresented to all purchasers during the Class Period that Defendants' generic Doxycycline prices were competitive and fair. Defendants' unlawful conduct had the following effects: (1) generic Doxycycline price competition was restrained, suppressed, and eliminated throughout Georgia; (2) generic Doxycycline prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Georgia. During the Class Period, Defendants' illegal conduct had a substantial effect on Georgia commerce and consumers. As a direct and proximate result of Defendants' violations of law, Plaintiffs and members of the Damages Class suffered an ascertainable loss of money or property as a result of Defendants' use or employment of unconscionable and deceptive commercial practices as set forth above and are threatened with further injury. That loss was caused by Defendants' willful and deceptive conduct, as described herein. Defendants' deception, including their affirmative misrepresentations and omissions concerning the price of generic Doxycycline, likely misled all purchasers acting reasonably under the circumstances to believe that they were purchasing generic Doxycycline at prices set by a free and fair market. Defendants'

misleading conduct and unconscionable activities constitute violations of Georgia Code § 10-1-370, *et seq*., and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute and as equity demands.

324.    **Michigan:** Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Michigan Consumer Protection Statute, Mich. Compiled Laws § 445.903, *et seq*.  Defendants agreed to, and did in fact, act in restraint of trade or commerce in Michigan, by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which generic Doxycycline were sold, distributed, or obtained in Michigan. Defendants deliberately failed to disclose material facts to Plaintiffs and members of the Damages Class concerning Defendants' unlawful activities and artificially inflated prices for generic Doxycycline. Defendants misrepresented to all purchasers during the Class Period that Defendants' generic Doxycycline prices were competitive and fair. Defendants' unlawful conduct had the following effects: (1) generic Doxycycline price competition was restrained, suppressed, and eliminated throughout Michigan; (2) generic Doxycycline prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Michigan. During the Class Period, Defendants' illegal conduct had a substantial effect on Michigan commerce and consumers. As a direct and proximate result of Defendants' violations of law, Plaintiffs and members of the Damages Class suffered an ascertainable loss of money or property as a result of Defendants' use or employment of unconscionable and deceptive commercial practices as set forth above. That loss was caused by Defendants' willful and deceptive conduct, as described herein. Defendants' deception, including their affirmative misrepresentations and omissions concerning the price of generic Doxycycline, likely misled all purchasers acting reasonably under the circumstances to believe that they were purchasing generic

Doxycycline at prices set by a free and fair market. Defendants' misleading conduct and unconscionable activities constitute violations of Mich. Compiled Laws § 445.903, *et seq*., and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

325.   **Minnesota:** Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Minnesota Uniform Deceptive Trade Practices Act, Minn. Stat. § 325D.43, *et seq*.  Defendants engaged in an unfair and deceptive trade practices during the course of their business dealings, which significantly impacted Plaintiffs as actual or potential consumers of the Defendants' goods and which caused Plaintiffs to suffer injury. Defendants took efforts to conceal their agreements from Plaintiffs. Defendants' unlawful conduct had the following effects: (1) generic Doxycycline price competition was restrained, suppressed, and eliminated throughout Minnesota; (2) generic Doxycycline prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Minnesota. During the Class Period, Defendants' illegal conduct substantially affected Minnesota commerce and consumers. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Minn. Stat. § 325D.43, *et seq*., and, accordingly, Plaintiffs and members of the Class seek all relief available under that statute and as equity demands.

326.   **Nebraska:** Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Nebraska Consumer Protection Act, Neb. Rev. Stat. § 59-1601, *et seq*.  Defendants' unlawful conduct had the following effects: (1) generic Doxycycline price competition was restrained, suppressed, and eliminated throughout Nebraska; (2) generic Doxycycline prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Nebraska. During the Class Period, Defendants marketed, sold,

or distributed generic Doxycycline in Nebraska, and Defendants' illegal conduct substantially affected Nebraska commerce and consumers. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Neb. Rev. Stat. § 59-1601, *et seq*., and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

327.   **Nevada:** Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Nevada Deceptive Trade Practices Act, Nev. Rev. Stat. § 598.0903, *et seq*.  Defendants agreed to, and did in fact, act in restraint of trade or commerce in Nevada, by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which generic Doxycycline were sold, distributed, or obtained in Nevada. Defendants deliberately failed to disclose material facts to Plaintiffs and members of the Damages Class concerning Defendants' unlawful activities and artificially inflated prices for generic Doxycycline. Defendants misrepresented to all purchasers during the Class Period that Defendants' generic Doxycycline prices were competitive and fair. Defendants' unlawful conduct had the following effects: (1) generic Doxycycline price competition was restrained, suppressed, and eliminated throughout Nevada; (2) generic Doxycycline prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Nevada. During the Class Period, Defendants' illegal conduct had a substantial effect on Nevada commerce and consumers. As a direct and proximate result of Defendants' violations of law, Plaintiffs and members of the Damages Class suffered an ascertainable loss of money or property as a result of Defendants' use or employment of unconscionable and deceptive commercial practices as set forth above. That loss was caused by Defendants' willful and deceptive conduct, as described herein. Defendants' deception, including their affirmative misrepresentations and omissions concerning the price of generic Doxycycline,

likely misled all purchasers acting reasonably under the circumstances to believe that they were purchasing generic Doxycycline at prices set by a free and fair market. Defendants' misleading conduct and unconscionable activities constitute violations of Nev. Rev. Stat. § 598.0903, *et seq.*, and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

328.   **New Hampshire:** Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the New Hampshire Consumer Protection Act, N.H. Rev. Stat. § 358-A:1, *et seq.*  Defendants' unlawful conduct had the following effects: (1) generic Doxycycline price competition was restrained, suppressed, and eliminated throughout New Hampshire; (2) generic Doxycycline prices were raised, fixed, maintained, and stabilized at artificially high levels throughout New Hampshire. During the Class Period, Defendants marketed, sold, or distributed generic Doxycycline in New Hampshire, and Defendants' illegal conduct substantially affected New Hampshire commerce and consumers. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of N.H. Rev. Stat. § 358-A:1, *et seq.*, and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

329.   **New Jersey:** Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the New Jersey Consumer Fraud Act, N.J. Statutes § 56:8-1, *et seq.*  Defendants agreed to, and did in fact, act in restraint of trade or commerce in New Jersey, by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which generic Doxycycline were sold, distributed, or obtained in New Jersey. Defendants deliberately failed to disclose material facts to Plaintiffs and members

of the Damages Class concerning Defendants' unlawful activities and artificially inflated prices for generic Doxycycline. Defendants misrepresented to all purchasers during the Class Period that Defendants' generic Doxycycline prices were competitive and fair. Defendants' unlawful conduct had the following effects: (1) generic Doxycycline price competition was restrained, suppressed, and eliminated throughout New Jersey; (2) generic Doxycycline prices were raised, fixed, maintained, and stabilized at artificially high levels throughout New Jersey. During the Class Period, Defendants' illegal conduct had a substantial effect on New Jersey commerce and consumers. As a direct and proximate result of Defendants' violations of law, Plaintiffs and members of the Damages Class suffered an ascertainable loss of money or property as a result of Defendants' use or employment of unconscionable and deceptive commercial practices as set forth above. That loss was caused by Defendants' willful and deceptive conduct, as described herein. Defendants' deception, including their affirmative misrepresentations and omissions concerning the price of generic Doxycycline, likely misled all purchasers acting reasonably under the circumstances to believe that they were purchasing generic Doxycycline at prices set by a free and fair market. Defendants' misleading conduct and unconscionable activities constitute violations of N.J. Statutes § 56:8-1, *et seq*., and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

330.   **New Mexico:** Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the New Mexico Stat. § 57-12-1, *et seq*. Defendants agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling and/or maintaining at non-competitive and artificially inflated levels, the prices at which generic Doxycycline were sold, distributed or obtained in New Mexico and took efforts to conceal their agreements from Plaintiffs and members of the Damages Class. The aforementioned

conduct on the part of Defendants constituted "unconscionable trade practices," in violation of N.M.S.A. Stat. § 57-12-3, in that such conduct, *inter alia*, resulted in a gross disparity between the value received by Plaintiffs and members of the Damages Class and the prices paid by them for generic Doxycycline as set forth in N.M.S.A., § 57-12-2E. Plaintiffs and members of the Damages Class were not aware of Defendants' price-fixing conspiracy and were therefore unaware that they were being unfairly and illegally overcharged. Defendants had the sole power to set that price, and Plaintiffs and members of the Damages Class had no power to negotiate a lower price. Moreover, Plaintiffs and members of the Damages Class lacked any meaningful choice in purchasing generic Doxycycline because they were unaware of the unlawful overcharge, and there was no alternative source of supply through which Plaintiffs and members of the Damages Class could avoid the overcharges. Defendants' conduct with regard to sales of generic Doxycycline, including their illegal conspiracy to secretly fix the price of generic Doxycycline at supracompetitive levels and overcharge consumers, was substantively unconscionable because it was one-sided and unfairly benefited Defendants at the expense of Plaintiffs and the public. Defendants took grossly unfair advantage of Plaintiffs and members of the Damages Class. The suppression of competition that has resulted from Defendants' conspiracy has ultimately resulted in unconscionably higher prices for consumers so that there was a gross disparity between the price paid and the value received for generic Doxycycline. Defendants' unlawful conduct had the following effects: (1) generic Doxycycline price competition was restrained, suppressed, and eliminated throughout New Mexico; (2) generic Doxycycline prices were raised, fixed, maintained, and stabilized at artificially high levels throughout New Mexico. During the Class Period, Defendants' illegal conduct substantially affected New Mexico commerce and consumers. As a direct and proximate result of the unlawful conduct of Defendants, Plaintiffs and members of the Damages Class have been

injured and are threatened with further injury. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of New Mexico Stat. § 57-12-1, *et seq*., and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

331.   **New York:** Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of N.Y. Gen. Bus. Law § 349, *et seq*. Defendants agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling and/or maintaining, at artificial and non-competitive levels, the prices at which generic Doxycycline were sold, distributed or obtained in New York and took efforts to conceal their agreements from Plaintiffs and members of the Damages Class. Defendants and their co-conspirators made public statements about the prices of generic Doxycycline that either omitted material information that rendered the statements that they made materially misleading or affirmatively misrepresented the real cause of price increases for generic Doxycycline; and Defendants alone possessed material information that was relevant to consumers, but failed to provide the information. Because of Defendants' unlawful trade practices in the State of New York, New York class members who indirectly purchased generic Doxycycline were misled to believe that they were paying a fair price for generic Doxycycline or the price increases for generic Doxycycline were for valid business reasons; and similarly situated consumers were affected by Defendants' conspiracy. Defendants knew that their unlawful trade practices with respect to pricing generic Doxycycline would have an impact on New York consumers and not just Defendants' direct customers. Defendants knew that their unlawful trade practices with respect to pricing generic Doxycycline would have a broad impact, causing consumer class members who indirectly purchased generic Doxycycline to be injured by paying more for generic Doxycycline

than they would have paid in the absence of Defendants' unlawful trade acts and practices. The conduct of Defendants described herein constitutes consumer-oriented deceptive acts or practices within the meaning of N.Y. Gen. Bus. Law § 349, which resulted in consumer injury and broad adverse impact on the public at large, and harmed the public interest of consumers in New York State in an honest marketplace in which economic activity is conducted in a competitive manner. Defendants' unlawful conduct had the following effects: (1) generic Doxycycline price competition was restrained, suppressed, and eliminated throughout New York; (2) generic Doxycycline prices were raised, fixed, maintained, and stabilized at artificially high levels throughout New York. During the Class Period, Defendants marketed, sold, or distributed generic Doxycycline in New York, and Defendants' illegal conduct substantially affected New York commerce and consumers. During the Class Period, each of Defendants named herein, directly, or indirectly and through affiliates they dominated and controlled, manufactured, sold and/or distributed generic Doxycycline in New York. Plaintiffs and members of the Damages Class seek all relief available pursuant to N.Y. Gen. Bus. Law § 349(h).

332.  **North Carolina:** Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of North Carolina Gen. Stat. § 75-1.1, *et seq*. Defendants agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling and/or maintaining, at artificial and non-competitive levels, the prices at which generic Doxycycline were sold, distributed or obtained in North Carolina and took efforts to conceal their agreements from Plaintiffs and members of the Damages Class. Defendants' price-fixing conspiracy could not have succeeded absent deceptive conduct by Defendants to cover up their illegal acts. Secrecy was integral to the formation, implementation and maintenance of Defendants' price-fixing conspiracy. Defendants committed inherently deceptive and self-

concealing actions, of which Plaintiffs and members of the Damages Class could not possibly have been aware. Defendants and their co-conspirators publicly provided pretextual and false justifications regarding their price increases. Defendants' public statements concerning the price of generic Doxycycline created the illusion of competitive pricing controlled by market forces rather than supracompetitive pricing driven by Defendants' illegal conspiracy. Moreover, Defendants deceptively concealed their unlawful activities by mutually agreeing not to divulge the existence of the conspiracy to outsiders. The conduct of Defendants described herein constitutes consumer-oriented deceptive acts or practices within the meaning of North Carolina law, which resulted in consumer injury and broad adverse impact on the public at large, and harmed the public interest of North Carolina consumers in an honest marketplace in which economic activity is conducted in a competitive manner. Defendants' unlawful conduct had the following effects: (1) generic Doxycycline price competition was restrained, suppressed, and eliminated throughout North Carolina; (2) generic Doxycycline prices were raised, fixed, maintained, and stabilized at artificially high levels throughout North Carolina. During the Class Period, Defendants marketed, sold, or distributed generic Doxycycline in North Carolina, and Defendants' illegal conduct substantially affected North Carolina commerce and consumers. During the Class Period, each of Defendants named herein, directly, or indirectly and through affiliates they dominated and controlled, manufactured, sold and/or distributed generic Doxycycline in North Carolina. Plaintiffs and members of the Damages Class seek actual damages for their injuries caused by these violations in an amount to be determined at trial and are threatened with further injury. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of North

Carolina Gen. Stat. § 75-1.1, *et seq*., and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

333.   **North Dakota:** Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the North Dakota Unlawful Sales or Advertising Practices Statute, N.D. Century Code § 51-15-01, *et seq*.  Defendants agreed to, and did in fact, act in restraint of trade or commerce in North Dakota, by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which generic Doxycycline were sold, distributed, or obtained in North Dakota. Defendants deliberately failed to disclose material facts to Plaintiffs and members of the Damages Class concerning Defendants' unlawful activities and artificially inflated prices for generic Doxycycline. Defendants misrepresented to all purchasers during the Class Period that Defendants' generic Doxycycline prices were competitive and fair. Defendants' unlawful conduct had the following effects: (1) generic Doxycycline price competition was restrained, suppressed, and eliminated throughout North Dakota; (2) generic Doxycycline prices were raised, fixed, maintained, and stabilized at artificially high levels throughout North Dakota. During the Class Period, Defendants' illegal conduct had a substantial effect on North Dakota commerce and consumers. As a direct and proximate result of Defendants' violations of law, Plaintiffs and members of the Damages Class suffered an ascertainable loss of money or property as a result of Defendants' use or employment of unconscionable and deceptive commercial practices as set forth above. That loss was caused by Defendants' willful and deceptive conduct, as described herein. Defendants' deception, including their affirmative misrepresentations and omissions concerning the price of generic Doxycycline, likely misled all purchasers acting reasonably under the circumstances to believe that they were purchasing generic Doxycycline at prices set by a free and fair market. Defendants' misleading

conduct and unconscionable activities constitute violations of N.D. Century Code § 51-15-01, *et seq*., and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

334.    **South Carolina:** Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of South Carolina Unfair Trade Practices Act, S.C. Code Ann. § 39-5-10, *et seq*. Defendants' combination or conspiracy had the following effects: (1) generic Doxycycline price competition was restrained, suppressed, and eliminated throughout South Carolina; (2) generic Doxycycline prices were raised, fixed, maintained, and stabilized at artificially high levels throughout South Carolina. During the Class Period, Defendants' illegal conduct had a substantial effect on South Carolina commerce and consumers. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of S.C. Code Ann. § 39-5-10, *et seq*., and, accordingly, Plaintiffs and the members of the Damages Class seek all relief available under that statute.

335.    **South Dakota:** Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the South Dakota Deceptive Trade Practices and Consumer Protection Statute, S.D. Codified Laws § 37-24-1, *et seq*.  Defendants agreed to, and did in fact, act in restraint of trade or commerce in South Dakota, by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which generic Doxycycline were sold, distributed, or obtained in South Dakota. Defendants deliberately failed to disclose material facts to Plaintiffs and members of the Damages Class concerning Defendants' unlawful activities and artificially inflated prices for generic Doxycycline. Defendants

misrepresented to all purchasers during the Class Period that Defendants' generic Doxycycline prices were competitive and fair. Defendants' unlawful conduct had the following effects: (1) generic Doxycycline price competition was restrained, suppressed, and eliminated throughout South Dakota; (2) generic Doxycycline prices were raised, fixed, maintained, and stabilized at artificially high levels throughout South Dakota. Defendants' illegal conduct substantially affected South Dakota commerce and consumers. As a direct and proximate result of Defendants' violations of law, Plaintiffs and members of the Damages Class suffered an ascertainable loss of money or property as a result of Defendants' use or employment of unconscionable and deceptive commercial practices as set forth above. That loss was caused by Defendants' willful and deceptive conduct, as described herein. Defendants' deception, including their affirmative misrepresentations and omissions concerning the price of generic Doxycycline, likely misled all purchasers acting reasonably under the circumstances to believe that they were purchasing generic Doxycycline at prices set by a free and fair market. Defendants' affirmative misrepresentations and omissions constitute information important to Plaintiffs and members of the Damages Class as they related to the cost of generic Doxycycline they purchased. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of S.D. Codified Laws § 37-24-1, *et seq*., and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

336. **West Virginia:** Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the West Virginia Consumer Credit and Protection Act, W.Va. Code § 46A-6-101, *et seq.* Defendants agreed to, and did in fact, act in restraint of trade or commerce in a market that includes West Virginia, by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which generic

Doxycycline were sold, distributed, or obtained in West Virginia. Defendants deliberately failed to disclose material facts to Plaintiffs and members of the Damages Class concerning Defendants' unlawful activities and artificially inflated prices for generic Doxycycline. Defendants affirmatively misrepresented to all purchasers during the Class Period that Defendants' generic Doxycycline prices were competitive and fair. Defendants' unlawful conduct had the following effects: (1) generic Doxycycline price competition was restrained, suppressed, and eliminated throughout West Virginia; (2) generic Doxycycline prices were raised, fixed, maintained, and stabilized at artificially high levels throughout West Virginia. Defendants' illegal conduct substantially affected West Virginia commerce and consumers. As a direct and proximate result of Defendants' violations of law, Plaintiffs and members of the Damages Class suffered an ascertainable loss of money or property as a result of Defendants' use or employment of unconscionable and deceptive commercial practices as set forth above. That loss was caused by Defendants' willful and deceptive conduct, as described herein. Defendants' deception, including their affirmative misrepresentations and omissions concerning the price of generic Doxycycline, likely misled all purchasers acting reasonably under the circumstances to believe that they were purchasing generic Doxycycline at prices set by a free and fair market. Defendants' affirmative misrepresentations and omissions constitute information important to Plaintiffs and members of the Damages Class as they related to the cost of generic Doxycycline they purchased. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of W.Va. Code § 46A-6-101, *et seq*., and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

337. **Wisconsin:** Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Wisconsin Consumer Protection

Statutes, Wisc. Stat. § 100.18, *et seq*. Defendants agreed to, and did in fact, act in restraint of trade or commerce in a market that includes Wisconsin, by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which generic Doxycycline were sold, distributed, or obtained in Wisconsin. Defendants affirmatively misrepresented to all purchasers during the Class Period that Defendants' generic Doxycycline prices were competitive and fair. Defendants' unlawful conduct had the following effects: (1) generic Doxycycline price competition was restrained, suppressed, and eliminated throughout Wisconsin; (2) generic Doxycycline prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Wisconsin. Defendants' illegal conduct substantially affected Wisconsin commerce and consumers. As a direct and proximate result of Defendants' violations of law, Plaintiffs and members of the Damages Class suffered an ascertainable loss of money or property as a result of Defendants' use or employment of unconscionable and deceptive commercial practices as set forth above. That loss was caused by Defendants' willful and deceptive conduct, as described herein. Defendants' deception, including their affirmative misrepresentations concerning the price of generic Doxycycline, likely misled all purchasers acting reasonably under the circumstances to believe that they were purchasing generic Doxycycline at prices set by a free and fair market. Defendants' affirmative misrepresentations constitute information important to Plaintiffs and members of the Damages Class as they related to the cost of generic Doxycycline they purchased. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Wisc. Stat. § 100.18, *et seq*., and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

338. **U.S. Virgin Islands:** Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the U.S. Virgin Islands Consumer

Fraud and Deceptive Business Practices Act, 12A V.I.C. §§ 102, 301-35, *et seq*.  Defendants agreed to, and did in fact, act in restraint of trade or commerce in a market that includes U.S.V.I., by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which generic Doxycycline were sold, distributed, or obtained in U.S.V.I. Defendants deliberately failed to disclose material facts to Plaintiffs and members of the Damages Class concerning Defendants' unlawful activities and artificially inflated prices for generic Doxycycline. Defendants affirmatively misrepresented to all purchasers during the Class Period that Defendants' generic Doxycycline prices were competitive and fair. Defendants' unlawful conduct had the following effects: (1) generic Doxycycline price competition was restrained, suppressed, and eliminated throughout U.S.V.I.; (2) generic Doxycycline prices were raised, fixed, maintained, and stabilized at artificially high levels throughout U.S.V.I.. Defendants' illegal conduct substantially affected U.S.V.I. commerce and consumers. As a direct and proximate result of Defendants' violations of law, Plaintiffs and members of the Damages Class suffered an ascertainable loss of money or property as a result of Defendants' use or employment of unconscionable and deceptive commercial practices as set forth above and are threatened with further injury. That loss was caused by Defendants' willful and deceptive conduct, as described herein. Defendants' deception, including their affirmative misrepresentations and omissions concerning the price of generic Doxycycline, likely misled all purchasers acting reasonably under the circumstances to believe that they were purchasing generic Doxycycline at prices set by a free and fair market. Defendants' affirmative misrepresentations and omissions constitute information important to Plaintiffs and members of the Damages Class as they related to the cost of generic Doxycycline they purchased. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation

of 12A V.I.C. §§ 102, 301-35, *et seq*., and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute and as equity demands.

## FOURTH COUNT

## UNJUST ENRICHMENT
### (on behalf of Plaintiffs and the Damages Class)

339.     Plaintiffs incorporate by reference the allegations set forth above as if fully set forth herein.

340.     To the extent required, this claim is pleaded in the alternative to the other claims in this Complaint. This claim is brought under the equity precedents of each of the IRP Damages Jurisdictions.[100]

341.     Defendants have unlawfully benefited from their sales of generic Doxycycline because of the unlawful and inequitable acts alleged in this Complaint. Defendants unlawfully overcharged privately held pharmacies, who purchased generic Doxycycline at prices that were more than they would have been but for Defendants' unlawful actions.

342.     Defendants' financial benefits resulting from their unlawful and inequitable acts are traceable to overpayments by Plaintiffs and members of the Damages Class.

343.     Plaintiffs and the Damages Class have conferred upon Defendants an economic benefit, in the nature of profits resulting from unlawful overcharges, to the economic detriment of Plaintiffs and the Damages Class.

---

[100] Unjust enrichment claims are alleged herein under the laws of Alabama, Alaska, Arizona, Arkansas, California, Colorado, Delaware, Florida, Georgia, Idaho, Illinois, Iowa, Kansas, Louisiana, Maine, Maryland, Massachusetts, Michigan, Minnesota, Mississippi, Missouri, Montana, Nebraska, Nevada, New Hampshire, New Jersey, New Mexico, New York, North Carolina, North Dakota, Oregon, Pennsylvania, Rhode Island, South Carolina, South Dakota, Tennessee, Texas, Utah, Vermont, Virginia, Washington, West Virginia, Wisconsin and Wyoming as well as the District of Columbia, Puerto Rico and the U.S. Virgin Islands.

344.    Defendants have been enriched by revenue resulting from unlawful overcharges for generic Doxycycline while Plaintiffs have been impoverished by the overcharges they paid for generic Doxycycline imposed through Defendants' unlawful conduct.  Defendants' enrichment and Plaintiffs' impoverishment are connected.

345.    There is no justification for Defendants' retention of, and enrichment from, the benefits they received, which caused impoverishment to Plaintiffs and the Damages Class, because Plaintiffs and the Damages Class paid supracompetitive prices that inured to Defendants' benefit, and it would be inequitable for Defendants to retain any revenue gained from their unlawful overcharges.

346.    Plaintiffs did not interfere with Defendants' affairs in any manner that conferred these benefits upon Defendants.

347.    The benefits conferred upon Defendants were not gratuitous, in that they constituted revenue created by unlawful overcharges arising from Defendants' illegal and unfair actions to inflate the prices of generic Doxycycline.

348.    The benefits conferred upon Defendants are measurable, in that the revenue Defendants have earned due to their unlawful overcharges of generic Doxycycline are ascertainable by review of sales records.

349.     It would be futile for Plaintiffs and the Damages Class to seek a remedy from any party with whom they have privity of contract. Defendants have paid no consideration to any other person for any of the unlawful benefits they received indirectly from Plaintiffs and the Damages Class with respect to Defendants' sales of generic Doxycycline.

350.     It would be futile for Plaintiffs and the Damages Class to seek to exhaust any remedy against the immediate intermediary in the chain of distribution from which they indirectly

purchased generic Doxycycline, as the intermediaries are not liable and cannot reasonably be expected to compensate Plaintiffs and the Damages Class for Defendants' unlawful conduct.

351.    The economic benefit of overcharges and monopoly profits derived by Defendants through charging supracompetitive and artificially inflated prices for generic Doxycycline is a direct and proximate result of Defendants' unlawful practices.

352.    The financial benefits derived by Defendants rightfully belong to Plaintiffs and the Damages Class, because Plaintiffs and the Damages Class paid supracompetitive prices during the Class Period, inuring to the benefit of Defendants.

353.    It would be inequitable under unjust enrichment principles under the law of the District of Columbia and the laws of all states and territories of the United States, except Ohio and Indiana, for Defendants to be permitted to retain any of the overcharges for generic Doxycycline derived from Defendants' unlawful, unfair and unconscionable methods, acts, and trade practices alleged in this Complaint.

354.    Defendants are aware of and appreciate the benefits bestowed upon them by Plaintiffs and the Damages Class.  Defendants consciously accepted the benefits and continue to do so as of the date of this filing, as generic Doxycycline prices remain inflated above pre-conspiracy levels.

355.    Defendants should be compelled to disgorge in a common fund for the benefit of Plaintiffs and the Damages Class all unlawful or inequitable proceeds they received from their sales of generic Doxycycline.

356.    A constructive trust should be imposed upon all unlawful or inequitable sums received by Defendants traceable to indirect purchases of generic Doxycycline by Plaintiffs and the Damages Class. Plaintiffs and the Damages Class have no adequate remedy at law.

## XIII.   <u>PRAYER FOR RELIEF</u>

WHEREFORE, Plaintiffs demand judgment for the following relief:

A.     The Court determine that this action may be maintained as a class action under Rule 23(a), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure, and direct that reasonable Notice of this action, as provided by Rule 23(c)(2) of the Federal Rules of Civil Procedure, be given to each and every member of the Class;

B.     That the unlawful conduct, contract, conspiracy, or combination alleged herein be adjudged and decreed: (a) an unreasonable restraint of trade or commerce in violation of Section 1 of the Sherman Act; (b) a per se violation of Section 1 of the Sherman Act; (c) an unlawful combination, trust, agreement, understanding and/or concert of action in violation of the state antitrust and unfair competition and consumer protection laws as set forth herein; and (d) acts of unjust enrichment by Defendants as set forth herein.

C.     Plaintiffs and members of the Damages Class recover damages, to the maximum extent allowed under such state laws, and that a judgment in favor of Plaintiffs and members of the Damages Class be entered against Defendants jointly and severally in an amount to be trebled to the extent such laws permit;

D.     Plaintiffs and members of the Damages Class recover damages, to the maximum extent allowed by such laws, in the form of restitution and/or disgorgement of profits unlawfully obtained;

E.     Plaintiffs and members of the Damages Class be awarded restitution, including disgorgement of profits Defendants obtained as a result of their acts of unfair competition and acts of unjust enrichment, and the Court establish of a constructive trust consisting of all ill-gotten gains from which Plaintiffs and members of the Damages Class may make claims on a pro rata basis;

F.      Defendants, their affiliates, successors, transferees, assignees and other officers, directors, partners, agents and employees thereof, and all other persons acting or claiming to act on their behalf or in concert with them, be permanently enjoined and restrained from in any manner continuing, maintaining or renewing the conduct, contract, conspiracy, or combination alleged herein, or from entering into any other contract, conspiracy, or combination having a similar purpose or effect, and from adopting or following any practice, plan, program, or device having a similar purpose or effect;

G.      Plaintiffs and members of the Classes be awarded pre- and post- judgment interest as provided by law, and that such interest be awarded at the highest legal rate;

H.      Plaintiffs and members of the Classes recover their costs of suit, including reasonable attorneys' fees, as provided by law; and

I.      Plaintiffs and members of the Classes have such other and further relief as the case may require and the Court may deem just and proper.

## XIV.   JURY DEMAND

Plaintiffs demand a trial by jury, pursuant to Rule 38(b) of the Federal Rules of Civil

Procedure, of all issues so triable.


Dated: August 15, 2017                              Respectfully submitted,


                                                   */s/  Jonathan W. Cuneo*


Peter Gil-Montllor                        Jonathan W. Cuneo
Matthew Prewitt                           Joel Davidow
**CUNEO, GILBERT & LADUCA LLP**           Daniel Cohen
16 Court Street, Suite 1012               Victoria Romanenko
Brooklyn, NY 11241                        Blaine Finley
202-789-3960                              **CUNEO, GILBERT & LADUCA LLP**
pgil-montllor@cuneolaw.com                4725 Wisconsin Ave., NW Suite 200
                                          Washington, DC 20016
                                          202-789-3960
                                          jonc@cuneolaw.com

                                          *Lead Counsel for the Indirect Reseller Plaintiffs*